ELECTRONICALLY FILED
8/12/2025 10:53 AM
Lisa Henderson
County Clerk
San Juan County, WA
Case Number: 25-2-05070-28

1  Gerald Singleton, SBN 59010
   gsingleton@singletonschreiber.com
2  Vanessa Waldref, SBN 44396
   vwaldref@singletonschreiber.com
3  Daniel Fruchter, SBN 63591
   dfruchter@singletonschreiber.com
4  Kevin S. Hannon, *Pro Hac Vice*
   khannon@singletonschreiber.com
5  **SINGLETON SCHREIBER, LLP**
   108 N. Washington St., Suite 603
6  Spokane, WA 99201
   (509) 824-6222
7
8  *Counsel for Plaintiffs*

9  **IN THE SUPERIOR COURT OF WASHINGTON
   FOR SAN JUAN COUNTY**

10  JASMINE PROCACCINI, individually;          Case No. 25-2-05070-28
    VINCENT PROCACCINI, individually;
11  MARCO PROCACCINI, individually;
    NATHAN ROSS and COURTNEY
12  DIXON as parents and natural guardians of
    R.R. and P.R.; COURTNEY DIXON and
13  DANIEL STATON, as natural parents and
    guardians of P.S. and C.S.; DEVON
14  MORRIS, individually; JONATHAN          **SECOND AMENDED COMPLAINT
    GRAVES, individually; JANET ROSSI and   FOR MEDICAL MONITORING
15  RICHARD ROSSI, as guardians of R.R.R.;   RELIEF AND FOR PROPERTY
    DAVID HECKMAN, individually;            RELATED DAMAGES FOR
16  BEVERLY HECKMAN, individually;          CERTAIN PLAINTIFFS**
    KEVIN HECKMAN, individually; LINDA
17  HECKMAN, individually; KALEB
    HECKMAN, individually; ARIELLE
18  HECKMAN, individually; AMBER
    RACHELLE-HECKMAN LARSON,
19  individually; AUTUMN HAZEL,
    individually;  WILLIAM HAZEL,
20  individually; AUTUMN HAZEL and
    WILLIAM HAZEL, as parents and natural
21  guardians of A.H.; LINNEA ANDERSON
    and DAVID ANDERSON as parents and
22  natural guardians of A.L.A. and A.M.A.;
    PAULINA FALCON, individually; SEAN
23  BAKKEN, individually; PAUL HIATT and
    KIMBERLEE SOWERS as parents and
24  natural guardians of E.H. and M.H.;
25
26          Plaintiffs,
27  v.                                      SINGLETON SCHREIBER, LLP
                                            108 N. Washington St, Ste 603
28  THE 3M COMPANY f/k/a MINNESOTA          Spokane, WA 99201
    MINING AND MANUFACTURING CO.;           Telephone: (509) 824-6222

SECOND AMENDED COMPLAINT - 1

TYCO FIRE PRODUCTS, L.P., successor-in-interest to THE ANSUL COMPANY; JOHNSON CONTROLS INTERNATIONAL, PLC; CHEMGUARD, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; E.I. DUPONT DE NEMOURS AND COMPANY, and as successor in interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; THE CHEMOURS COMPANY, and as successor in interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; THE CHEMOURS COMPANY FC, LLC, and as successor in interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; CORTEVA, INC.; DUPONT DE NEMOURS, INC. f/k/a DOWDUPONT, INC.; ARKEMA, INC.; AGC CHEMICALS AMERICAS, INC.; DYNAXCORPORATION; CLARIANT CORPORATION; BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; AMEREX CORPORATION; ARCHROMA MANAGEMENT, LLC; DEEPWATER CHEMICALS, INC.; NATION FORD CHEMICAL COMPANY; CHEMICALS, INC.; and THE BOARD OF COMMISSIONERS OF SAN JUAN COUNTY FIRE DISTRICT NO. 3, a special purpose district and municipal corporation,

Defendants.

JASMINE PROCACCINI, individually; VINCENT PROCACCINI, individually; MARCO PROCACCINI, individually; NATHAN ROSS and COURTNEY DIXON, as parents and natural guardians of R.R. and P.R.; COURTNEY DIXON and DONALD STATON, as natural parent and guardian of P.S. and C.S.; DEVON MORRIS, individually; JONATHAN GRAVES, individually; JANET ROSSI and RICHARD ROSSI, as guardians of R.R.R.; DAVID HECKMAN, individually; BEVERLY HECKMAN, individually; KEVIN HECKMAN, individually; LINDA HECKMAN, individually; KALEB HECKMAN, individually; ARIELLE HECKMAN, individually; AMBER RACHELLE-HECKMAN LARSON; individually; AUTUMN HAZEL,

individually; WILLIAM HAZEL, individually; AUTUMN HAZEL and WILLIAM HAZEL, as parents and natural guardians of A.H.; LINNEA ANDERSON and DAVID ANDERSON, as parents and natural guardians of A.L.A. and A.M.A.; PAULINA FALCON, individually; SEAN BAKKEN, individually; PAUL HIATT and KIMBERLEE SOWERS, as parents and natural guardians of E.H. and M.H. (hereinafter "Plaintiffs"), by and through undersigned counsel, file this Second Amended Complaint against THE 3M COMPANY f/k/a MINNESOTA MINING AND MANUFACTURING CO.; TYCO FIRE PRODUCTS, L.P., successor-in-interest to THE ANSUL COMPANY; JOHNSON CONTROLS INTERNATIONAL, PLC; CHEMGUARD, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; E.I. DUPONT DE NEMOURS AND COMPANY, and as successor in interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; THE CHEMOURS COMPANY, and as successor in interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; THE CHEMOURS COMPANY FC, LLC, and as successor in interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; CORTEVA, INC.; DUPONT DE NEMOURS, INC. f/k/a DOWDUPONT, INC.; ARKEMA, INC.; AGC CHEMICALS AMERICAS INC.; DYNAXCORPORATION; CLARIANT CORPORATION; BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; AMEREX CORPORATION; ARCHROMA MANAGEMENT, LLC; DEEPWATER CHEMICALS, INC.; NATION FORD CHEMICAL COMPANY; CHEMICALS, INC.; and THE BOARD OF COMMISSIONERS OF SAN JUAN COUNTY FIRE DISTRICT NO. 3, a special purpose district and municipal corporation (collectively referred to herein as the "Defendants"), and allege as follows:

1.      Plaintiffs are current and/or former residents of the County of San Juan, Washington (hereinafter "the County"), located in the neighborhood of Hannah Heights. The Hannah Heights Water System, which supplied household water to Plaintiffs, has been contaminated by the presence of chemicals designed, manufactured, distributed, discharged, and/or sold by Manufacturer Defendants, resulting in harm and injury to Plaintiffs.

2.      Plaintiffs bring this action against Defendants for injuries suffered while owning and/or occupying residential real property in the County, due to significant exposure to per- and polyfluoroalkyl substances (hereinafter "PFAS") contained in aqueous film forming foam (hereinafter "AFFF"), a fire suppressant designed, manufactured, distributed, sold, and/or discharged by Defendants, resulting in injury to Plaintiffs.

3.      Manufacturer Defendants[1] designed, manufactured, sold, and/or distributed AFFF containing toxic PFAS components with knowledge of and without adequate warnings of the toxic effects AFFF and/or its toxic PFAS components would cause when they were released into the environment and consumed by humans.  Manufacturer Defendants continued this conduct without regard to Plaintiffs who would foreseeably be exposed to these chemicals once they infiltrated the environment, including groundwater and private wells.

4.      For decades, Manufacturer Defendants manufactured, sold, and/or distributed AFFF, and/or its toxic PFAS components, to San Juan Island Fire & Rescue, including the Board of Commissioners of San Juan County Fire District No. 3 (hereinafter the "Fire District"), that subsequently used and/or disposed of AFFF at Little Mountain Fire Station 33 ("FS33") located 3189 Bailer Hill Road, San Juan County, WA, 98250. FS33 is proximate to the properties of Plaintiffs and has been identified by the Washington State Department of Ecology as the source of the PFAS contamination on the properties

---

[1] Manufacturer Defendants shall hereinafter refer to the following entities: The 3M Company, Tyco Fire Products, L.P., successor in interest to the Ansul Company, Johnson Controls International, PLC, Chemguard, Inc., Buckeye Fire Equipment Company, E.I. Dupont de Nemours and Company, and as successor in interest to Dupont Chemical Solutions Enterprise, The Chemours Company, and as successor in interest to Dupont Chemical Solutions Enterprise, The Chemours Company FC, LLC, and as successor in interest to Dupont Chemical Solutions Enterprise, Corteva, Inc., Dupont de Nemours Inc., f/k/a Dowdupont, Inc., Arkema Inc., AGC Chemicals Americas Inc., Dynaxcorporation, Clariant Corporation, BASF Corporation, Chemdesign Products, Inc. Amerex Corporation, Archroma Management LLC, Deepwater Chemicals, Inc., Nation Ford Chemical Company, and Chemicals, Inc.

occupied by Plaintiffs, based on documented storage and/or use of AFFF at the facility.[2]

5.  Since the 1970s, releases of AFFF containing toxic PFAS components from FS33 migrated into groundwater and private household wells in the surrounding areas. Without knowledge of this toxic PFAS contamination, Plaintiffs have been injured and significantly exposed to and ingested toxic PFAS components from AFFF sold and/or distributed by Manufacturer Defendants and released by Defendant Fire District at FS33.

6.  As a remedy for Defendants' conduct, including its failure to warn of the known dangers of AFFF, Plaintiffs seek to be made whole for the cost of diagnostic testing for the early detection of illness, disease, and/or disease process made medically necessary by their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF released and/or discharged by Defendant Fire District at FS33, also known as medical monitoring.

7.  Plaintiffs obtained their household water from the Hannah Heights Water System ("HHWS") - primarily from Well 2 – operated by the Hannah Heights Owners Association.  For decades, Plaintiffs' household water supply has been contaminated by the toxic PFAS components of Manufacturer Defendants' AFFF, which include perfluorooctane sulfonate ("PFOS"), perfluorooctanoic acid ("PFOA"), perfluoroheptanoic acid ("PFHpA"), and other species of PFAS used by Defendant Fire District at FS33.  As a result of Defendants' conduct, Plaintiffs' exposure to and consumption of known toxic PFAS components from Manufacturer Defendants' AFFF has occurred and has increased, and continues to increase, the likelihood they will develop an illness, disease, and/or disease process that they otherwise would not without such significant exposure.

8.  PFAS are known hazardous chemicals and substances.  When PFAS from AFFF are ingested and absorbed into a person's bloodstream and tissue, they bioaccumulate, biomagnify, and remain in their bodies for years.  The toxic PFAS were

---

[2] Memorandum from GeoEngineers Inc. to State of Washington, Department of Ecology, *Data Review Memorandum Little Mountain Fire Station No. 33* (Nov. 25, 2024).

absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies.  Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.  As a result, consumption of toxic PFAS components from Manufacturer Defendants' AFFF are known to alter the structure of the human body and results in an increased risk of illness, disease, and/or disease process, including but not limited to thyroid disease, testicular cancer, and kidney cancer.

9.      As a result of the releases of Manufacturer Defendants' AFFF, and its toxic PFAS components by Defendant Fire District at FS33, on April 15, 2023, San Juan County Health and Community Services ("HCS") declared a state of emergency and advised residents that received household water from Well 2 not to use or drink their household water due to the PFAS contamination.[3]

10.     Plaintiffs' risks of illness, disease, and/or disease process from significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF has existed, and will continue to exist.  As a result, Plaintiffs have been injured by the acts and/or omissions of Defendants that caused Manufacturer Defendants' toxic PFAS components in AFFF released and discharged by Defendant Fire District at FS33 to contaminate household water supplies in surrounding areas, which Plaintiffs then consumed, resulting in an increased risk of disease and the pecuniary loss of medically necessary diagnostic testing for the early detection of PFAS-related illness, disease, and/or disease process.

11.     Manufacturer Defendants' AFFF and its toxic PFAS components included fluorochemical surfactants, including PFOS, PFOA, and/or certain other PFAS that degrade into PFOS or PFOA.

---

[3] San Juan County Washington, *Hannah Heights System Tests Positive for PFAS*, Health and Community Services (Apr. 15, 2023), https://www.sanjuancountywa.gov/CivicAlerts.aspx?AID=1369.

12. As the manufacturers, sellers, and/or distributors of AFFF, and its toxic PFAS components, Manufacturer Defendants knew or should have known since at least the 1960s and 1970s that the inclusion of toxic PFAS components in AFFF presented an unreasonable risk to human health. Manufacturer Defendants also knew or should have known by that time that PFAS are highly soluble in water, and highly mobile and persistent in the environment, and therefore are highly likely to contaminate water supplies when released into the environment.

13. Nonetheless, Manufacturer Defendants marketed, sold, and/or distributed their products with knowledge that large quantities of AFFF containing toxic PFAS components would be used in fire training exercises and emergency situations, including by Defendant Fire District at FS33, knowing that these toxic PFAS components would be and were released into the environment. Manufacturer Defendants knew or should have known that when used as intended, discharge of AFFF, and its toxic PFAS components, into the environment was certain to come into contact with drinking water supplies, which would become contaminated and create health risks.

14. Plaintiffs' residences and/or their persons have been exposed for years, if not decades, to toxic PFAS components from Manufacturer Defendants' AFFF including at concentrations hazardous to human health. Plaintiffs had no way to know that they were consuming water contaminated with toxic PFAS components until the contamination was disclosed to them after the testing in April 2023. Plaintiffs water distribution systems, property, water heaters, soil, and other physical parts of the properties, which they occupied and from which they consumed household water were, and are, contaminated with toxic PFAS from Manufacturer Defendants' AFFF used and discharged by Defendant Fire District at FS33.

15. Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary

diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

16.    Defendant Fire District used Manufacturer Defendants' AFFF in fire training exercises, fighting fires, in annual testing, and for other purposes for decades at FS33.  As a result, toxic PFAS components used in Manufacturer Defendants' AFFF released by Defendant Fire District migrated into the groundwater nearby FS33 and into the HHWS, including Well 2, contaminating the well utilized to supply Plaintiffs with household water.

17.    In April 2023, sampling and testing of the HHWS detected toxic PFAS components from Manufacturer Defendants' AFFF used at FS33 at levels hazardous to human health.[4]

18.    Well 2, which has provided roughly 70% of water consumed by Plaintiffs, produced sampling results that detected PFOS at 2460 parts per trillion ("ppt"), six-hundred-and-fifteen times United States Environmental Protection Agency's ("US EPA") 4 ppt Maximum Contaminant Level ("MCL"); PFHxS at 2900 ppt, two-hundred-and-ninety times the 10 ppt MCL; and PFOA at 146 ppt, over thirty-six times the 4 ppt MCL.[5]

19.    Subsequent testing revealed even higher concentrations of PFOA at 306 ppt, PFOS at 6750 ppt, and PFHxS at 6800 ppt at the Upper Fracture Seep and PFOA at 373 ppt, PFOS at 9400 ppt, and PFHxS at 7550 ppt at the Pitless Adaptor.[6]

20.    On June 25, 2025, the Washington State Department of Ecology Toxics Cleanup Program issued a Soil and Groundwater Investigation Report, which confirmed that the PFAS concentrations in soil and groundwater "represent the primary components of legacy AFFF."[7]  The report states that the highest levels of PFAS were identified in

---

[4] *Id.*

[5] Maximum Contaminant Level Goals (MCLGs) for PFOA and PFOS is 0.  EPA, *Per-and Polyfluoroalkyl Substances (PFAS) Final PFAS National Primary Drinking Water Regulation*, https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last visited Apr. 1, 2025).

[6] Memorandum from GeoEngineers Inc. to State of Washington, Department of Ecology, *Data Review Memorandum Little Mountain Fire Station No. 33* (Nov. 25, 2024).

[7] GeoEngineers, *Bailer Hill Technical Support – Soil and Groundwater Investigation Report*, 1-543, 14 (June 25, 2025).

shallow soil samples collected from the areas south of FS33, including those surrounding Well No. 2, indicating that the contamination was likely introduced by a surface release. The report concludes that the "distribution and magnitude of these impacts support the conclusion that legacy AFFF use at the station is the primary source of PFAS contamination to both soil and groundwater."[8]

21.    Plaintiffs do not presently have a sufficient alternate water source to the contaminated Well 2 in place.

22.    Plaintiffs, in the past, ingested PFAS contaminated water from their households because of Defendants' conduct in developing, manufacturing, distributing, selling, and/or discharging AFFF at FS33 with knowledge of its toxicity and without providing adequate warnings detailing the consequences.  The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies.  Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

23.    Plaintiffs' significant exposure to toxic PFAS components in AFFF have caused them bodily harm in the form of detrimental alteration of their bodies biochemical process, along with the structure and function of their bodies, and therefore past, present, and future injury.

24.    As a result of Plaintiffs' significant exposure to PFAS from AFFF, they have suffered past, present, and future increased risk of PFAS related illness, diseases, and/or disease processes.  PFAS-related illness, diseases, and/or disease processes are often latent or misidentified, making specialized diagnostic testing for early detection medically reasonably necessary and beneficial.  Because of Plaintiffs' significant exposure to toxic

---

[8] *Id.* at 22.

PFAS components from Manufacturer Defendants' AFFF resulting from Defendant Fire District's use of Manufacturer Defendants' AFFF, Plaintiffs have incurred the present medical need and present pecuniary loss and injury of the costs associated with such medically necessary diagnostic testing and medical tests.

25.     As a result of the contamination, Plaintiffs presently require and, in the future will require, diagnostic testing for the early detection of illness, disease, and/or disease processes caused by exposure to toxic PFAS components in Manufacturer Defendants' AFFF.[9]  It is well-known that many of the serious illnesses, diseases, and/or disease processes caused by toxic PFAS exposure can be asymptomatic in the patient prior to the manifestation of significant and sometimes fatal illnesses or diseases.

26.     Manufacturer Defendants' negligent development, manufacturing, distribution, marketing, and/or sale of AFFF and other PFAS-containing products caused the contamination of Plaintiffs' properties with PFAS.

27.     Through their development, manufacturing, distribution, marketing, and/or sale of AFFF; violations of the Model Toxics Control Act ("MTCA"), Chapter 70A.305 RCW; the Washington Consumer Protect Act ("CPA"), Chapter 19.86 RCW; and through their nuisance and negligence, Manufacturer Defendants proximately caused Plaintiffs' injuries and damages, as detailed herein.

28.     Defendant Fire District's releases of AFFF at FS33, which are hazardous substances, onto neighboring properties, including at FS33, caused Plaintiffs to incur and continue to incur costs.  From at least 1992 until 2016, the Fire District, through its use and handling of Manufacturer Defendants' AFFF as intended during training events and other activities, released toxic PFAS containing AFFF to groundwater surrounding FS33.

29.     It is beneficial to Plaintiffs to know of any latent illness, disease, and/or disease process from their exposure to PFAS contaminated water due to Manufacturer Defendants' design, manufacture, sale, and/or distribution of AFFF to fire stations,

---

[9] See *Information on the C-8 (PFOA) Medical Monitoring Program Screening Tests*, http://www.c-8medicalmonitoringprogram.com/docs/med_panel_education_doc.pdf (last accessed Apr. 10, 2025).

including Defendant Fire District for use at FS33. Therefore, Plaintiffs' injuries make it reasonably necessary that they incur the present and future costs of diagnostic testing. Notice and diagnostic plans described herein will equip Plaintiffs and their doctors with the requisite knowledge to take appropriate steps to protect themselves from latent illness, disease, and/or disease process.

30. Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

31. As a result of Defendants' conduct, Plaintiffs have been significantly exposed to Manufacturer Defendants' AFFF used by Defendant Fire District at FS33 through consuming household water at their residences and absorbing it through their gastrointestinal tract, where it was absorbed into their blood and distributed in their bodies. The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies. Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

32. Plaintiffs bring this suit to recover the costs of medical monitoring for the early detection of illness, disease, and/or disease processes caused by the PFAS water contamination of the HHWS and Plaintiffs' household water supply, caused by Defendants' conduct.

///
///

I.      **PARTIES**

    a.  **PLAINTIFFS**

33.      Plaintiffs are individuals who at times relevant to this action occupied real property in the County that received household water from the Hannah Heights Water System (HHWS), and were exposed to and ingested a significant amount of toxic PFAS components released at FS33 through the use of Manufacturer Defendants' AFFF by Defendant Fire District.  Located on the western edge of San Juan Island in Puget Sound, these properties are situated on a relatively remote, rocky island with scarce access to fresh water and limited options to connect to or create new water sources.

34.      Plaintiff Jasmine Procaccini, at relevant times to this action, occupied the real property located at 54 Brower Lane, San Juan County, WA 98250 and obtained her household water from the HHWS.  Plaintiff Jasmine Procaccini resided at this address from May 2016 to April 2022, consuming household water.  Plaintiff Jasmine Procaccini has been significantly exposed to, and ingested, PFAS-contaminated household water caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as described below.  As a result of Defendant Fire District's use and release of Manufacturing Defendants' AFFF, Plaintiff Jasmine Procaccini consumed household water that was contaminated by the toxic PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire District.  The toxic PFAS were absorbed, at a minimum, through Plaintiff Jasmine Procaccini's gastrointestinal tract, bioaccumulated in her body, and distributed to the organs of her body through her blood, which in turn altered the structure and function of her body.

35.      Plaintiff Vincent Procaccini, at relevant times to this action, occupied the real property located at 54 Brower Lane, San Juan County, WA 98250 and obtained his household water from the HHWS.  Plaintiff Vincent Procaccini resided at this address from May 2016 to March 2023, consuming household water, returning in January 2024 and residing there until September 2024, when he left for college, but returning during school recess.  Plaintiff Vincent Procaccini has been significantly exposed to, and ingested, PFAS-

1    contaminated household water caused by use of Manufacturer Defendants' PFAS-based
2    AFFF by Defendant Fire District at FS33 as described below.  As a result of Defendant
3    Fire District's use and release of Manufacturing Defendants' AFFF, Plaintiff Vincent
4    Procaccini consumed household water that was contaminated by the toxic PFAS
5    components of Manufacturer Defendants' AFFF released by Defendant Fire District.  The
6    toxic PFAS were absorbed, at a minimum, through Plaintiff Vincent Procaccini's
7    gastrointestinal tract, bioaccumulated in his body, and distributed to the organs of his body
8    through his blood, which in turn altered the structure and function of his body.  Plaintiff
9    Vincent Procaccini has also suffered significant harms and losses because of the PFAS-
10   contamination of his household water supply caused by use of Manufacturer Defendants'
11   PFAS-based AFFF by Defendant Fire District at FS33, as described below, including but
12   not limited to the loss of use of his home, the loss of use of his household water supply,
13   and the loss of use and enjoyment of his property.  Plaintiff Vincent Procaccini's harms
14   and losses also include the annoyance and inconvenience of not being able to use household
15   water, limiting the frequency and duration of his bathing, using bottled water for oral
16   hygiene, and having to seek alternative water.

17        36.    Plaintiff Marco Procaccini, at relevant times to this action, occupied the real
18   property located at 54 Brower Lane, San Juan County, WA 98250 and obtained his
19   household water from the HHWS.  Plaintiff Marco Procaccini resided at this address from
20   May 2016 to September 2024, consuming household water, when he left for college, but
21   returning during school recess.  Plaintiff Marco Procaccini has been significantly exposed
22   to, and ingested, PFAS-contaminated household water caused by use of Manufacturer
23   Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as described below.
24   As a result of Defendant Fire District's use and release of Manufacturing Defendants'
25   AFFF, Plaintiff Marco Procaccini consumed household water that was contaminated by
26   the toxic PFAS components of Manufacturer Defendants' AFFF released by Defendant
27   Fire District.  The toxic PFAS were absorbed, at a minimum, through Plaintiff Marco
28   Procaccini's gastrointestinal tract, bioaccumulated in his body, and distributed to the

organs of his body through his blood, which in turn altered the structure and function of his body.  Plaintiff Marco Procaccini has also suffered significant harms and losses because of the PFAS-contamination of his household water supply caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33, as described below, including but not limited to the loss of use of his home, the loss of use of his household water supply, and the loss of use and enjoyment of his property.  Plaintiff Marco Procaccini's harms and losses also include the annoyance and inconvenience of not being able to use household water, limiting the frequency and duration of his bathing, using bottled water for oral hygiene, and having to seek alternative water.

37.    Plaintiffs Nathan Ross and Courtney Dixon, at relevant times to this action, own and occupy the real property located at 49 Brower Lane, San Juan County, WA 98250, and obtained their household water from the HHWS.  Plaintiffs Nathan Ross and Courtney Dixon purchased the property in January 2020, residing there with their minor children, R.R. and P.R., consuming household water.  Plaintiffs Courtney Dixon and Donald Staton's minor children, P.S. and C.S. also began residing at the property in January 2020, for 26 weeks per year, consuming household water.  Plaintiffs R.R., P.R., P.S., and C.S. have been significantly exposed to, and ingested, PFAS-contaminated household water caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as described below.  As a result of Defendant Fire District's use and release of Manufacturing Defendants' AFFF, Plaintiffs R.R., P.R., P.S., and C.S. consumed household water that was contaminated by the toxic PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire District.  The toxic PFAS were absorbed, at a minimum, through Plaintiffs R.R., P.R., P.S., and C.S.' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies.  Plaintiffs R.R., P.R., P.S., and C.S. have also suffered significant harms and losses because of the PFAS-contamination of their household water supply caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33, as described below, including but

1    not limited to the loss of use of their home, the loss of use of their household water supply,

2    and the loss of use and enjoyment of their property.  Plaintiffs R.R., P.R., P.S., and C.S.'

3    harms and losses also include the annoyance and inconvenience of not being able to use

4    household water, including for outdoor activities, the inability to consume produce grown

5    at the property, limiting the frequency and duration of their bathing, using bottled water for

6    oral hygiene, and limited visits with friends at the home.

7          38.     Plaintiff Devon Morris, at relevant times to this action, occupied the real

8    property located at 323 Straits View Drive, San Juan County, WA 98250, and obtained his

9    household water from the HHWS.  Plaintiff Devon Morris resided at the property on a part-

10   time basis from 2003 to 2009.  Plaintiff Devon Morris returned to the property in November

11   2021, residing there full-time until February 2025, consuming household water, along with

12   fruits and vegetables grown in the garden.  Plaintiff Devon Morris has been significantly

13   exposed to, and ingested, PFAS-contaminated household water caused by use of

14   Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as

15   described below.  As a result of Defendant Fire District's use and release of Manufacturing

16   Defendants' AFFF, Plaintiff Devon Morris consumed household water that was

17   contaminated by the toxic PFAS components of Manufacturer Defendants' AFFF released

18   by Defendant Fire District.   The toxic PFAS were absorbed, at a minimum, through

19   Plaintiff Devon Morris' gastrointestinal tract, bioaccumulated in his body, and distributed

20   to the organs of his body through his blood, which in turn altered the structure and function

21   of his body.  Plaintiff Devon Morris has also suffered significant harms and losses because

22   of the PFAS-contamination of his household water supply caused by use of Manufacturer

23   Defendants' PFAS-based AFFF by Defendant Fire District at FS33, as described below,

24   including but not limited to the loss of use of his home, the loss of use of his household

25   water supply, and the loss of use and enjoyment of his property.  Plaintiff Devon Morris'

26   harms and losses include the annoyance and inconvenience of not being able to use

27   household water, including the inability to garden and consume the produce grown at the

28   property, limiting the frequency and duration of his bathing, using bottled water for oral

1   hygiene, limiting the use of household water for washing his car, laundry, and outdoor
2   space, and having to seek alternative water.

3          39.     Plaintiff Jonathan Graves, at relevant times to this action, occupied the real
4   property located at 323 Straits View Drive, San Juan County, WA 98250, and obtained his
5   household water from the HHWS.  Plaintiff Jonathan Graves resided at the property from
6   November 2021 to February 2025, consuming household water, along with fruits and
7   vegetables grown in the garden.  Plaintiff Jonathan Graves has been significantly exposed
8   to, and ingested, PFAS-contaminated household water caused by use of Manufacturer
9   Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as described below.
10  As a result of Defendant Fire District's use and release of Manufacturer Defendants' AFFF,
11  Plaintiff Jonathan Graves consumed household water that was contaminated by the toxic
12  PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire District.
13  The toxic PFAS were absorbed, at a minimum, through Plaintiff Jonathan Graves'
14  gastrointestinal tract, bioaccumulated in his body, and distributed to the organs of his body
15  through his blood, which in turn altered the structure and function of his body.  Plaintiff
16  Jonathan Graves has also suffered significant harms and losses because of the PFAS-
17  contamination of his household water supply caused by use of Manufacturer Defendants'
18  PFAS-based AFFF by Defendant Fire District at FS33, as described below, including but
19  not limited to the loss of use of his home, the loss of use of his household water supply,
20  and the loss of use and enjoyment of his property.  Plaintiff Jonathan Graves' harms and
21  losses include the annoyance and inconvenience of not being able to use household water,
22  including the inability to garden and consume the produce grown at the property, limiting
23  the frequency and duration of his bathing, using bottled water for oral hygiene, limiting the
24  use of household water in terms of washing his car, laundry, and outdoor space, and having
25  to seek alternative water.

26         40.     Plaintiffs Janet Rossi and Richard Rossi, at relevant times to this action,
27  own and occupy the real property located at 16 Elliott Way, San Juan County, WA 98250,
28  and obtained their household water from the HHWS.  Plaintiffs Janet and Richard Rossi

1   purchased the property in 2021 and resided there with their grandson, R.R.R., who began

2   residing at the property 4 to 5 days per week in July 2021 and now lives at the property

3   full-time, consuming household water.  Plaintiff R.R.R. has been significantly exposed to,

4   and ingested, PFAS-contaminated household water caused by use of Manufacturer

5   Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as described below.

6   As a result of Defendant Fire District's use and release of Manufacturing Defendants'

7   AFFF, Plaintiff R.R.R. consumed household water that was contaminated by the toxic

8   PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire District.

9   The toxic PFAS were absorbed, at a minimum, through Plaintiff R.R.R.'s gastrointestinal

10  tract, bioaccumulated in his body, and distributed to the organs of his body through his

11  blood, which in turn altered the structure and function of his body.  Plaintiff R.R.R. has

12  also suffered significant harms and losses because of the PFAS-contamination of his

13  household water supply caused by use of Manufacturer Defendants' PFAS-based AFFF by

14  Defendant Fire District at FS33, as described below, including but not limited to the loss

15  of use of his home, the loss of use of his household water supply, and the loss of use and

16  enjoyment of his property.  Plaintiff R.R.R.'s harms and losses include the annoyance and

17  inconvenience of not being able to use household water, including the inability to engage

18  in outdoor recreation and consume produce grown at the property, limiting the frequency

19  and duration of his bathing, and using bottled water for oral hygiene.

20      41.   Plaintiff David Heckman, at relevant times to this action, occupied the real

21  property located at 38 Elliott Way, San Juan County, WA 98250, and obtained his

22  household water from the HHWS.  Plaintiff David Heckman began visiting the property in

23  1986 on a yearly basis, consuming household water.  Plaintiff David Heckman has been

24  significantly exposed to, and ingested, PFAS-contaminated household water caused by use

25  of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as

26  described below.  As a result of Defendant Fire District's use and release of Manufacturing

27  Defendants' AFFF, Plaintiff David Heckman consumed household water that was

28  contaminated by the toxic PFAS components of Manufacturer Defendants' AFFF released

SECOND AMENDED COMPLAINT - 17

by Defendant Fire District. The toxic PFAS were absorbed, at a minimum, through Plaintiff David Heckman's gastrointestinal tract, bioaccumulated in his body, and distributed to the organs of his body through his blood, which in turn altered the structure and function of his body.

42. Plaintiff Beverly Heckman, at relevant times to this action, occupied the real property located at 38 Elliott Way, San Juan County, WA 98250, and obtained her household water from the HHWS. Plaintiff Beverly Heckman began visiting the property in 2004, visiting at least 10 times a year for 3-5 days, and consuming household water, until her late husband had a stroke in 2018. Plaintiff Beverly Heckman has been significantly exposed to, and ingested, PFAS-contaminated household water caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as described below. As a result of Defendant Fire District's use and release of Manufacturing Defendants' AFFF, Plaintiff Beverly Heckman consumed household water that was contaminated by the toxic PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire District. The toxic PFAS were absorbed, at a minimum, through Plaintiff Beverly Heckman's gastrointestinal tract, bioaccumulated in her body, and distributed to the organs of her body through her blood, which in turn altered the structure and function of her body.

43. Plaintiffs Kevin Heckman and Linda Heckman, at relevant times to this action, occupied the real property located at 38 Elliott Way, San Juan County, WA 98250, and obtained their household water from the HHWS. Plaintiffs Kevin and Linda Heckman visited the property during school breaks, four to six times a year for 5-10 days per visit, from 1987 to 2002, consuming household water. From 2003 to 2022, Plaintiffs Kevin and Linda Heckman visited the property seven to ten times per year for 5-14 days per visit, consuming household water. Plaintiffs Kevin and Linda Heckman have been significantly exposed to, and ingested, PFAS-contaminated household water caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as described below. As a result of Defendant Fire District's use and release of Manufacturing

Defendants' AFFF, Plaintiffs Kevin and Linda Heckman consumed household water that was contaminated by the toxic PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire District. The toxic PFAS were absorbed, at a minimum, through Plaintiffs Kevin and Linda Heckman's gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies.

44. Plaintiffs Kaleb Heckman and Arielle Heckman, at relevant times to this action, occupied the real property located at 38 Elliott Way, San Juan County, WA 98250, and obtained their household water from the HHWS. Plaintiff Kaleb Heckman visited the property, during school breaks, four to six times a year for 5-10 days per visit from 1990 to 2003, and from 2004 to 2013, he continued to visit annually, consuming household water. In 2017, Plaintiffs Kaleb and Arielle Heckman began visiting the property together, and from 2018 to 2022, they visited three times a year for 4 days at a time, consuming household water. Plaintiffs Kaleb and Arielle Heckman have been significantly exposed to, and ingested, PFAS-contaminated household water caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as described below. As a result of Defendant Fire District's use and release of Manufacturing Defendants' AFFF, Plaintiffs Kaleb and Areille Heckman consumed household water that was contaminated by the toxic PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire District. The toxic PFAS were absorbed, at a minimum, through Plaintiffs Kaleb and Areille Heckman's gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies.

45. Plaintiff Amber Rachelle-Heckman Larson, at relevant times to this action, occupied the real property located at 38 Elliott Way, San Juan County, WA 98250, and obtained her household water from the HHWS. Plaintiff Amber Rachelle-Heckman Larson visited the property during school breaks, four to six times a year for 5-10 days per visit from 1987 to 1998, consuming household water. Plaintiff Amber Rachelle-Heckman

1    Larson continued to visit the property from 1998 until 2005, three to four times per year
2    for 4 to 7 days, from 2005 to 2007, two times a year for a week, from 2008 to 2022, three
3    to four times per year for 4 to 7 days, consuming household water.  Plaintiff Amber
4    Rachelle-Heckman Larson has been significantly exposed to, and ingested, PFAS-
5    contaminated household water caused by use of Manufacturer Defendants' PFAS-based
6    AFFF by Defendant Fire District at FS33 as described below.  As a result of Defendant
7    Fire District's use and release of Manufacturing Defendants' AFFF, Plaintiff Amber
8    Rachelle-Heckman Larson consumed household water that was contaminated by the toxic
9    PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire District.
10   The toxic PFAS were absorbed, at a minimum, through Plaintiff Amber Rachelle-Heckman
11   Larson's gastrointestinal tract, bioaccumulated in her body, and distributed to the organs
12   of her body through her blood, which in turn altered the structure and function of her body.
13          46.     Plaintiffs Autumn Hazel and William Hazel, at relevant times to this action,
14   occupied the real property located at 38 Elliott Way, San Juan County, WA 98250, and
15   obtained their household water from the HHWS.  Plaintiff Autumn Hazel visited the
16   property as a child during school breaks, four to six times a year for 5-10 days per visit
17   from 1987 until 2000, consuming household water.  Plaintiffs Autumn Hazel and William
18   Hazel began visiting the property together in 2008, two to three times per year for 4 to 7
19   days, and when expecting their child, A.H., as well as after the birth in 2020, until June
20   2021, consuming household water.  Plaintiffs Autumn Hazel, William Hazel, and A.H.
21   have been significantly exposed to, and ingested, PFAS-contaminated household water
22   caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District
23   at FS33 as described below.  As a result of Defendant Fire District's use and release of
24   Manufacturing Defendants' AFFF, Plaintiffs Autumn Hazel, William Hazel, and A.H.
25   consumed household water that was contaminated by the toxic PFAS components of
26   Manufacturer Defendants' AFFF released by Defendant Fire District.  The toxic PFAS
27   were absorbed, at a minimum, through Plaintiffs Autumn Hazel, William Hazel, and A.H.'s
28   gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their

SECOND AMENDED COMPLAINT - 20

bodies through their blood, which in turn altered the structure and function of their bodies.

47.    Plaintiffs Linnea Anderson and David Anderson, at relevant times to this action, own and occupy the real property located at 151 Straits View Drive, San Juan County, WA 98250, and obtained their household water from the HHWS.  Plaintiffs Linnea and David Anderson rented the property in June 2013 to April 2016, living there with their minor child A.M.A., and returned to the property and purchased it in September 2019, residing there with their minor children A.L.A. and A.M.A., consuming household water along with fruits and vegetables grown in the garden.  Plaintiffs A.L.A. and A.M.A. have been significantly exposed to, and ingested, PFAS-contaminated household water caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as described below.   As a result of Defendant Fire District's use and release of Manufacturing Defendants' AFFF, Plaintiffs A.L.A. and A.M.A. consumed household water that was contaminated by the toxic PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire District.  The toxic PFAS were absorbed, at a minimum, through Plaintiffs A.L.A. and A.M.A.'s gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies.  Plaintiffs A.L.A. and A.M.A. have also suffered significant harms and losses because of the PFAS-contamination of their household water supply caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33, as described below, including but not limited to the loss of use of their home, the loss of use of their household water supply, and the loss of use and enjoyment of their property.  Plaintiffs A.L.A. and A.M.A.'s harms and losses include the annoyance and inconvenience of not being able to use household water, including for outdoor activities, limiting the frequency and duration of their bathing, using bottled water for oral hygiene, concern about friends visiting their home, and bathing at friends' homes during visits, resulting in further inconvenience.

48.    Plaintiff Paulina Falcon, at relevant times to this action, occupied the real property located at 179 Straits View Drive, San Juan County, WA 98250, and obtained her

1    household water from the HHWS.  Plaintiff Paulina Falcon has resided at the property since

2    July 2020, consuming household water.  Plaintiff Paulina Falcon has been significantly

3    exposed to, and ingested, PFAS-contaminated household water caused by use of

4    Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as

5    described below.  As a result of Defendant Fire District's use and release of Manufacturing

6    Defendants' AFFF, Plaintiff Paulina Falcon consumed household water that was

7    contaminated by the toxic PFAS components of Manufacturer Defendants' AFFF released

8    by Defendant Fire District.  The toxic PFAS were absorbed, at a minimum, through

9    Plaintiff Paulina Falcon's gastrointestinal tract, bioaccumulated in her body, and

10   distributed to the organs of her body through her blood, which in turn altered the structure

11   and function of her body.  Plaintiff Paulina Falcon has also suffered significant harms and

12   losses because of the PFAS-contamination of her household water supply caused by use of

13   Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33, as

14   described below, including but not limited to the loss of use of her home, the loss of use of

15   her household water supply, and the loss of use and enjoyment of her property.  Plaintiff

16   Paulina Falcon's harms and losses includes the annoyance and inconvenience of not being

17   able to use household water, including the inability to garden and consume the produce

18   grown at the property, limiting the frequency and duration of her bathing, using bottled

19   water for oral hygiene, and the inability to wash her car on property.

20          49.    Plaintiff Sean Bakken, at relevant times to this action, occupied the real

21   property located at 179 Straits View Drive, San Juan County, WA 98250, and obtained his

22   household water from the HHWS.  Plaintiff Sean Bakken has resided at the property since

23   2016, consuming household water.  Plaintiff Sean Bakken has been significantly exposed

24   to, and ingested, PFAS-contaminated household water caused by use of Manufacturer

25   Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as described below.

26   As a result of Defendant Fire District's use and release of Manufacturing Defendants'

27   AFFF, Plaintiff Sean Bakken consumed household water that was contaminated by the

28   toxic PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire

District.  The toxic PFAS were absorbed, at a minimum, through Plaintiff Sean Bakken's gastrointestinal tract, bioaccumulated in his body, and distributed to the organs of his body through his blood, which in turn altered the structure and function of his body.  Plaintiff Sean Bakken has also suffered significant harms and losses because of the PFAS-contamination of his household water supply caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33, as described below, including but not limited to the loss of use of his home, the loss of use of his household water supply, and the loss of use and enjoyment of his property.  Plaintiff Sean Bakken's harms and losses include the annoyance and inconvenience of not being able to use household water, including the inability to garden and consume the produce grown at the property, limiting the frequency and duration of his bathing, and using bottled water for oral hygiene.

50.     Plaintiffs Paul Hiatt and Kimberlee Sowers, at relevant times to this action, own and occupy the real property located at 3203 Bailer Hill Road, San Juan County, WA 98250, and obtained their household water from the HHWS.  Plaintiffs Paul Hiatt and Kimberlee Sowers purchased the property in 2014, residing there with their minor children, E.H. and M.H., consuming household water.  Plaintiffs E.H. and M.H. have been significantly exposed to, and ingested, PFAS-contaminated household water caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33 as described below.  As a result of Defendant Fire District's use and release of Manufacturing Defendants' AFFF, Plaintiffs E.H. and M.H. consumed household water that was contaminated by the toxic PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire District.  The toxic PFAS were absorbed, at a minimum, through Plaintiffs E.H. and M.H.'s gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies.  Plaintiffs E.H. and M.H. have also suffered significant harms and losses because of the PFAS-contamination of their household water supply caused by use of Manufacturer Defendants' PFAS-based AFFF by Defendant Fire District at FS33, as described below, including but not limited to the loss of use of their

1   home, the loss of use of their household water supply, and the loss of use and enjoyment

2   of their property.  Plaintiffs E.H. and M.H.'s harms and losses include the annoyance and

3   inconvenience of not being able to use household water, including for outdoor activities,

4   limiting the frequency and duration of their bathing, using bottled water for oral hygiene,

5   the inability to consume the produce grown at the property, and limited visits with friends

6   at the home.

7   **b. DEFENDANTS**

8   51.    Defendant The 3M Company ("3M") is a corporation organized and

9   existing under the laws of the State of Delaware, with its principal place of business at 3M

10  Center, St. Paul, MN 55133, and is registered to do, and doing, business in the State of

11  Washington.  Beginning before 1970 and until at least 2002, 3M manufactured, sold, and/or

12  distributed AFFF.  3M sold military specification AFFF that contained toxic PFAS

13  components to fire stations around the country, including in the State of Washington and

14  to Defendant Fire District for use at FS33.

15  52.    Defendant Tyco Fire Products LP ("Tyco") is a limited partnership

16  organized and existing under the laws of the State of Delaware, with a principal place of

17  business at One Stanton Street, Marinette, WI 54143, and is registered to do, and doing,

18  business in the State of Washington.  Tyco manufactures the Ansul brand of products and

19  is the successor in interest to the corporation formerly known as The Ansul Company

20  (hereinafter "Ansul" and included in any reference to Tyco).  At all times relevant, Tyco

21  manufactured, sold, and/or distributed fire suppression products, including AFFF that was

22  comprised of fluorocarbon surfactants containing PFAS.  Defendant Tyco sold and/or

23  distributed AFFF to fire stations, including FS33.

24  53.    Defendant Johnson Controls International, PLC is a corporation organized

25  and existing under the laws of Ireland, with a principal place of business at 5757 N. Green

26  Bay Ave., Milwaukee, WI 53209, and is registered to do, and doing, business in the State

27  of Washington.   On or about September 2, 2016, Johnson Controls merged with a

28  subsidiary of Tyco's parent company, Tyco International PLC, named Jagara Merger Sub

1  LLC.   Johnson Controls was the surviving corporation.   After the merger, Tyco

2  International PLC changed its name to Johnson Controls International, PLC.

3      54.   Tyco is an indirect subsidiary wholly owned by Johnson Controls.  Since

4  approximately September 2, 2016, Tyco and Johnson Controls have maintained service

5  agreements under which Johnson Controls provides certain services, including

6  environmental consulting and management, to Tyco.  Since that time, Johnson Controls

7  has authorized, supervised, directed, performed, and/or failed to perform the acts alleged

8  in this Complaint.

9      55.   Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and

10  existing under the laws of the State of Texas, with its principal place of business at One

11  Stanton Street, Marinette, WI 54143.  Chemguard is an indirect subsidiary wholly owned

12  by Johnson Controls, acquired by Tyco in 2011.  Chemguard does business throughout the

13  United States, including conducting business in the State of Washington.  At all times

14  relevant to the present litigation, Chemguard designed, manufactured, and sold AFFF

15  containing PFAS that was used in training operations and to fight fires at fire stations and

16  other locations throughout the country, including at FS33.

17      56.   On information and belief, Chemguard was acquired by Tyco International

18  Ltd. in 2011.

19      57.   On information and belief, 3M and Chemguard also designed,

20  manufactured, marketed, sold, and/or distributed fluorosurfactants containing PFOS,

21  PFOA, and/or their chemical precursors for use in AFFF products.

22      58.   UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc.

23  ("UTC Fire"), is a North Carolina corporation, with its principal place of business at 3211

24  Progress Drive, Lincolnton, NC 28092, and is registered to do, and doing, business in the

25  State of Washington.  At all times relevant to this litigation, UTC Fire designed,

26  manufactured, and/or sold AFFF used for training operations and fighting fires at numerous

27  locations throughout the country, including at FS33.

28  ///

SECOND AMENDED COMPLAINT - 25

59. National Foam, Inc. (a/k/a Chubb National Foam) is a Delaware corporation, with its principal place of business at 141 Junny Road, Angier, NC 27501. At all times relevant herein, National Foam Inc. designed, manufactured, and/or sold AFFF containing PFAS that was used for training and to fight fires at numerous locations throughout the country, including FS33.

60. Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc. ("Kidde Fire") is a Pennsylvania corporation, with its principal place of business at One Carrier Place, Farmington, CT 06032. At all times relevant herein, Kidde Fire designed, manufactured, and/or sold AFFF containing PFAS that was used in training operations and for emergency fire-fighting situations at numerous locations throughout the country, including at FS33.

61. Kidde PLC, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc. ("Kidde"), is a Massachusetts corporation, with its principal place of business at One Carrier Place, Farmington, CT 06032. At times relevant to the present litigation, Kidde designed, manufactured, and/or sold AFFF containing PFAS that was used in training operations and for emergency fire-fighting situations at numerous locations throughout the country, including at FS33.

62. Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a Massachusetts corporation with its principal place of business at 400 Main Street, Ashland, MA 01721. At all times relevant to this litigation, Kidde-Fenwal designed, manufactured, and/or sold AFFF used in training operations and for emergency fire-fighting situations at numerous locations throughout the country, including at FS33.

63. Upon information and belief, Fenwal, Inc. was incorporated on June 21, 1988, and later changed its name to Kidde-Fenwal, Inc.

64. Upon information and belief, the Canadian Intellectual Property Office has registered the National Foam trademark to Kidde-Fenwal, formerly registered to Kidde Fire.

///

65.     Upon information and belief, Kidde-Fenwal is part of the UTC Climate Control & Security unit of UTC Fire.

66.     Enterra Corporation ("Enterra") is a Massachusetts corporation.  At all times relevant, Enterra designed, manufactured, and/or sold AFFF used in training operations and for emergency fire-fighting situations at numerous locations, including at FS33.  Upon information and belief, Enterra is the current holder of the National Foam trademark.

67.     Carrier Global Corporation f/k/a Carrier Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, FL 33418, and is registered to do, and doing, business in the State of Washington.

68.     On information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business prior to merging with Raytheon Company a month later.  On information and belief, Carrier became successor in interest to Kidde-Fenwal as part of the spin off and is legally responsible for the liabilities arising from Kidde-Fenwal's design, manufacture, marketing, sale, and/or distribution of AFFF.

69.     National Foam, Inc.; Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc., and as successor in interest to National Foam, Inc.; Kidde Plc, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc., and as successor in interest to National Foam, Inc.; Kidde-Fenwal, Inc., and as successor in interest to National Foam, Inc.; UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc.; Enterra Corporation; and Carrier Global Corporation, and as successor in interest to National Foam, Inc. are collectively referred to herein as "National Foam."

70.     At all times relevant herein, National Foam designed, manufactured, and/or sold AFFF used in training operations and for emergency fire-fighting situations at numerous locations throughout the country, including at FS33.

///

71.     Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, NC 28086.  Buckeye does business throughout the United States, including conducting business in the State of Washington.

72.     At all times relevant to the present litigation, Buckeye Fire designed, manufactured, sold, and/or distributed AFFF containing PFAS used in training operations and for emergency fire-fighting situations at numerous locations throughout the country, including at FS33.

73.     DuPont Chemical Solutions Enterprise ("DuPont Chemical") was a Delaware Corporation, with a principal place of business located at 1007 Market Street, Wilmington, DE 19898.  DuPont Chemical was a member of the Telomer Research Program ("TRP").  As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.  In a letter addressed to the Office of Pollution Prevention and Toxics ("OPPT") Document Control Office, dated May 14, 2003, and signed by Stephen H. Korzeniowski, DuPont provided its list of telomer-based sales products in the United States for the year 2002.

74.     The letter, which was redacted and sent to the US EPA under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.[10]

75.     At all times relevant to the present litigation, DuPont Chemical designed, manufactured, and/or sold AFFF used for training and to fight fires at numerous locations across the United States, including FS33.

76.     Defendant E.I. Du Pont de Nemours and Company ("E.I. DuPont"), successor in interest to DuPont Chemical, is a Delaware Corporation that does business throughout the United States.   Its principal place of business is 974 Centre Road,

---

[10] Federal Regulations, *PFOA Stewardship Program Docket*, https://www.regulations.gov/docket/EPA-HQ-OPPT-2006-0621 (last visited Mar. 10, 2025).

Wilmington, DE 19805 and it is registered to do, and doing, business in the State of Washington.

77.    At all times relevant herein, E.I. DuPont designed, manufactured, and/or sold AFFF used for training and to fight fires at numerous locations throughout the country, including FS33.

78.    Defendant The Chemours Company ("Chemours"), successor in interest to DuPont Chemical, is a Delaware Corporation and conducts business throughout the United States, including in the State of Washington.  Its principal place of business is 1007 Market Street, Wilmington, DE 19889 and it is registered to do, and doing, business in the State of Washington.

79.    Chemours was incorporated as a subsidiary of E.I. Du Pont on April 30, 2015.  From that time until July 2015, Chemours was a wholly owned subsidiary of E.I. Du Pont.  In July 2015, E.I. Du Pont spun off Chemours and transferred to Chemours its "performance chemicals" business line, which included the fluoroproducts business, distributing shares of Chemours stock to E.I. Du Pont stockholders, and Chemours has since been an independent, publicly traded company.

80.    Upon information and belief, at all times relevant to the present litigation, Chemours designed, manufactured, and/or sold AFFF used for training and to fight fires at numerous locations throughout the country, including FS33.

81.    E.I. Du Pont merged with The Dow Chemical Company[11] in August 2017 to create DowDuPont Inc. ("DowDuPont").  E.I. Du Pont and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont.  Since that time, DowDuPont has affected a series of separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, as discussed below.

---

[11] The Dow Chemical Company is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2211 H.H. Dow Way, Midland, MI 48642, and is registered to do, and doing, business in the State of Washington.

82.     Defendant The Chemours Company FC L.L.C. ("Chemours Company"), successor in interest to DuPont Chemical, is a Delaware Corporation and conducts business throughout the United States.  Its principal place of business is 1007 Market Street Wilmington, DE 19899 and is registered to do, and doing, business in the State of Washington.

83.     Upon information and belief, at times relevant herein, Chemours Company designed, manufactured, and/or sold AFFF used for training and to fight fires at numerous locations throughout the country, including FS33.

84.     Defendant DuPont de Nemours Inc. ("DuPont"), f/k/a DowDuPont, is a Delaware Corporation that conducts business throughout the United States, including in the State of Washington.  Its principal place of business is 1999 Bryan Street, Suite 900, Dallas, TX 75201.

85.     Upon information and belief, at times relevant to the present litigation, DuPont de Nemours manufactured, designed, and/or sold AFFF and/or PFAS constituents in AFFF that was used for training and to fight fires at numerous locations throughout the country, including FS33.

86.     Defendant Corteva, Inc. ("Corteva") is a Delaware Corporation that conducts business throughout the United States.  Its principal place of business is 974 Centre Rd., Wilmington, DE 19805 and is registered to do, and doing, business in the State of Washington.

87.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.

88.     Corteva, Inc. was initially formed in February 2018.  From that time until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont.

89.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend. Following that distribution, Corteva, Inc. is the direct parent of DuPont and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional

1    businesses.

2         90.    At times relevant to the present litigation, Corteva designed, manufactured,

3    and/or sold AFFF and/or PFAS constituents in AFFF that was used for training and to fight

4    fires at numerous locations throughout the country, including FS33.

5         91.    On June 1, 2019, DowDuPont, the surviving entity after the spin-off of

6    Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de

7    Nemours, Inc., to be known as DuPont ("New DuPont").  New DuPont retained assets in

8    the specialty products business lines following the above-described spin-offs, as well as

9    the balance of the financial assets and liabilities of E.I. DuPont, not assumed by Corteva,

10   Inc.

11        92.    Defendants E.I. DuPont; Chemours; Chemours Company; Corteva; and

12   New DuPont are collectively referred to as "DuPont" throughout this Complaint.

13        93.    Defendant Arkema Inc. ("Arkema") is a corporation organized and existing

14   under the laws of Pennsylvania, with its principal place of business at 900 First Avenue,

15   King of Prussia, PA 19406, and is registered to do, and doing, business in the State of

16   Washington.

17        94.    Arkema develops specialty chemicals and fluoropolymers.  Arkema is a

18   successor in interest to Elf Atochem North America ("Elf Atochem") and Atofina

19   Chemicals Inc ("Atofina").

20        95.    Arkema, Elf Atochem, and/or Atofina Chemicals manufactured and/or sold

21   PFAS or PFAS constituents for use in AFFF for training and to fight fires at numerous

22   locations throughout the country, including at FS33.

23        96.    Defendant AGC Chemicals Americas Inc. ("AGC Americas") is a

24   corporation organized and existing under the laws of Delaware, having a principal place of

25   business in 5 East Uwchlan Avenue, Suite 201, Exton, PA 19341.  AGC Americas operates

26   throughout the United States, including in the State of Washington, manufacturing glass,

27   electronic displays, and chemical products, including resins, water and oil repellants,

28   greenhouse films, silica additives, and various fluorointermediates.

SECOND AMENDED COMPLAINT - 31

97.     AGC Americas manufactured and/or sold PFASs or PFAS constituents for use in AFFF that was used for training and to fight fires at numerous locations throughout the country, including FS33.

98.     Defendant Dynax Corporation ("Dynax") is a Delaware Corporation that conducts business throughout the United States, including in the State of Washington.  Its principal place of business is 103 Fairview Park Drive, Elmsford, NY 10523-1544.

99.     In 1991, Dynax Corporation (f/k/a Daikin-TLIM Co., Ltd.) entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

100.    On information and belief, at times relevant to the present litigation, Dynax designed, manufactured, and/or sold AFFF and/or PFAS constituents in AFFF that was used for training and to fight fires at numerous locations throughout the country, including FS33.

101.    Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, NC 28205, and is registered to do, and doing, business in the State of Washington.

102.    On information and belief, Clariant was formerly known as Sandoz Chemical Corporation ("Sandoz") and as Sodyeco, Inc. ("Sodyeco").

103.    On information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz.  On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.  Clariant, Sandoz, and/or Sodyeco manufactured and/or sold PFAS or PFAS constituents for use in AFFF at numerous locations throughout the country, including at FS33.

104.    Defendant BASF Corporation ("BASF") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 100 Park Avenue, Florham Park, NJ 07932, and is registered to do, and doing, business in the State of Washington.

105.    On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America.

106.    On information and belief, BASF Corporation is the successor in interest to Ciba- Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc. ("Ciba-Geigy"), Swiss specialty chemicals companies.

107.    Ciba-Geigy manufactured and/or sold PFAS or PFAS components for use in AFFF at numerous locations throughout the country, including FS33.

108.    Defendant ChemDesign Products, Inc. ("Chemdesign") is a corporation organized and existing under the laws of Texas and having a principal place of business at 2 Stanton Street, Marinette, WI 54143.

109.    ChemDesign manufactured PFAS or PFAS constituents for Tyco and Chemguard to use in AFFF at numerous locations throughout the country, including FS33.

110.    Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173, and is registered to do, and doing, business in the State of Washington.  Defendant Amerex is a manufacturer of firefighting products.  Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.  In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe. On information and belief, beginning in 2011, Amerex designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS, including but not limited to PFOA and PFOS, that was released and/or discharged at FS33.

111.    Defendant Archroma Management LLC ("Archroma") is a foreign corporation organized and existing under the laws of Switzerland, with its a principal place of business at Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

112.    On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

113.    On information and belief, Archroma designed, manufactured, marketed, sold, and/or distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products for training and to fight fires at numerous locations throughout the country, including FS33.

114.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.

115.    On information and belief, Deepwater Chemicals designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were used for training and to fight fires at numerous locations throughout the country, including FS33.

116.    Defendant Nation Ford Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, SC 29715.

117.    On information and belief, Nation Ford supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were used for training and to fight fires at numerous locations throughout the country, including FS33.

118.    Defendant Chemicals, Inc. ("Chemicals, Inc.") is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520.

119.    On information and belief, Chemicals, Inc. supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were used for training and to fight fires at numerous locations throughout the country, including FS33.

120.    The 3M Company; Tyco Fire Products, L.P., successor-in-interest to the Ansul Company; Johnson Controls International, PLC; Chemguard, Inc.; Buckeye Fire Equipment Company; E.I. Dupont de Nemours and Company, and as successor in interest

1  to Dupont Chemical Solutions Enterprise; The Chemours Company, and as successor in

2  interest to Dupont Chemical Solutions Enterprise; The Chemours Company FC, LLC, and

3  as successor in interest to Dupont Chemical Solutions Enterprise; Corteva, Inc.; Dupont de

4  Nemours Inc., f/k/a Dowdupont, Inc.; Arkema Inc.; AGC Chemicals Americas Inc.;

5  Dynaxcorporation; Clariant Corporation; BASF Corporation; Chemdesign Products, Inc.;

6  Amerex Corporation; Archroma Management LLC; Deepwater Chemicals, Inc.; Nation

7  Ford Chemical Company; and Chemicals, Inc. are hereinafter referred to as "Manufacturer

8  Defendants".

9      121.    Manufacturer Defendants represent all or substantially all the market for

10  AFFF and toxic PFAS components used, discharged, released, and/or disposed of at FS33.

11      122.    Defendant Board of Commissioners of San Juan County Fire District No. 3

12  ("Fire District") is a special purpose district and municipal corporation with its principal

13  place of business at 1011 Mullis Street, San Juan County, WA 98250.  On April 10 and 11,

14  2025, Plaintiffs provided notice to the Fire District pursuant to Revised Code of

15  Washington (RCW) 4.96.020.  As of the date of this filing, Fire District has not resolved

16  the claims therein stated; thus, the sixty-day notice period has elapsed, permitting this

17  action to proceed under the statutory framework.

18      123.    Manufacturer Defendants supplied, manufactured, marketed, sold, and/or

19  distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use in

20  AFFF products that were stored, handled, used, trained with, tested equipment with,

21  otherwise discharged and/or disposed at FS33 by Defendant Fire District.  Manufacturer

22  Defendants, at all times material herein, acted by and through their respective agents,

23  servants, officers, and employees, actual or ostensible, who were acting within the course

24  and scope of their actual or apparent agency, authority, or duties; thus, Manufacturer

25  Defendants are liable based on such activities, directly and vicariously.

26      124.    On information and belief, Defendant Fire District, at all times material

27  herein, acted by and through their respective agents, servants, officers, and employees,

28  actual or ostensible, who were acting within the course and scope of their actual or apparent

agency, authority, or duties; thus, Defendant Fire District is liable based on such activities, directly and vicariously.

## II.    **JURISDICTION AND VENUE**

125.    The Superior Court of San Juan County in the State of Washington has jurisdiction over the parties and the subject matter of this litigation pursuant to the RCW 2.08.010 and RCW 2.08.210.

126.    Venue is proper in this court pursuant to RCW 4.12.010, 4.12.020, and 4.12.025 because the subject of this action arises out of injury to real properties located in San Juan County, the amount in controversy exceeds $100,000, the events or omissions by Defendants giving rise to the claims asserted herein occurred in this County, and Defendant Fire District and certain Plaintiffs reside in this County.

127.    This Court has personal jurisdiction over Defendants pursuant to RCW 4.28.180, RCW 4.28.185, and RCW 19.86.160 because the acts alleged herein have been committed in this State.

128.    Manufacturer Defendants were and are engaged in substantial business in the State of Washington, as detailed herein, and all operate, conduct, engage in, carry on, and/or transact business in this State, thereby purposefully directing themselves at this forum by committing tortious acts within this State, as herein alleged, which arise out of and directly relate to Plaintiffs' causes of action.  As Manufacturer Defendants, their affiliates, and/or their agents have purposefully availed themselves of the benefit of their presence in the State of Washington in such a manner, the exercise of jurisdiction is reasonable and does not offend the notions of fair play and substantial justice.

## III.    **GENERAL ALLEGATIONS**

129.    PFAS are a family of synthetic chemicals containing fluorine and carbon atoms that do not exist in nature.

130.    Manufacturer Defendants used toxic PFAS components to produce AFFF which was sold and/or distributed to fire districts across the United States, including Defendant Fire District, and used at fire stations across the country, including FS33.  FS33

is a fire station that is part of San Juan Island Fire and Rescue, which is governed by the Board of Commissioners of San Juan County Fire District No. 3 (Defendant "Fire District").  FS33 located approximately 50 feet from Well 2 in the HHWS.[12]

131.    PFAS are persistent in the environment.  Due to the strength of multiple carbon- fluorine bonds, PFAS break down slowly in the environment, are chemically biologically stable, resistant to environmental degradation, and can persist in the environment for decades.  PFAS are also water soluble, making them mobile in groundwater and the environment.

132.    The two most widely known and studied PFAS are PFOA and PFOS.

133.    Toxicology studies show that after oral exposure, PFAS are readily absorbed into the human bloodstream and tissue and accumulate in the human body.[13]

134.    The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies. Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

135.    There are numerous health risks associated with exposure to PFAS.  For example, PFOS and PFOA exposure in humans is associated with increased risk of testicular cancer and kidney cancer, disorders such as thyroid disease, high cholesterol, ulcerative colitis, pregnancy-induced hypertension, and other conditions.[14]  The US EPA has also advised that exposure to PFAS may result in developmental effects to fetuses

---

[12] See Washington Department of Ecology, *Initial Investigation Report – San Juan* (June 2, 2023).

[13] Jinfeng Zhang, *et al., Dietary Exposure to Per- And Polyfluoroalkyl Substances: Potential Health Impacts on Human Liver*, Science of the Total Environment 907 (2024), https://doi.org/10.1016/j.scitotenv.2023.167945.

[14] US EPA, *Fact Sheet – PFOA & PFOS Drinking Water Health Advisories*, https://www.epa.gov/sites/default/files/2016-05/documents/drinkingwaterhealthadvisories_pfoa_pfos_5_19_16.final_.1.pdf (last visited Mar. 11, 2025).

during pregnancy or to breast-fed infants.[15]

136.    On information and belief, use of Manufacturer Defendants' AFFF by Defendant Fire District at FS33 in firefighting and training dates from the 1970s through 2020.  Upon information and belief, storage of AFFF persists at FS33.

137.    Toxic PFAS components Manufacturer Defendants' AFFF, released by Defendant Fire District at FS33, have migrated, and continue to migrate, from areas of release on FS33 to the wells throughout the HHWS and have entered and contaminated Plaintiffs' real properties, water rights, wells, and water systems including household piping.

138.    Plaintiffs reside, or formerly resided, in residential properties connected to the HHWS and in close proximity to FS33.

139.    Concentrations of toxic PFAS components found in the HHWS, which provides Plaintiffs with household water, has been caused by releases of Manufacturer Defendants' AFFF by Defendant Fire District into the environment at FS33.  As was reasonably foreseeable by Manufacturer Defendants, AFFF containing toxic PFAS components were discharged onto open ground and surface waters during fire training, fire suppression, and other exercises.  As was reasonably foreseeable, AFFF, including toxic PFAS components, migrated into and through the soil in and around FS33 and to the groundwater under FS33.  From there, AFFF, and its toxic PFAS components, migrated to Plaintiffs' private groundwater wells, which are now contaminated.

140.    The PFAS contamination is therefore directly and proximately linked to Manufacturer Defendants' manufacture, sale, and/or distribution of AFFF containing toxic PFAS components and subsequent use, release, and/or discharge by Defendant Fire District at FS33.

141.    Because of Manufacturer Defendants' tortious conduct in manufacture, sale, and/or distribution of AFFF containing toxic PFAS components, Plaintiffs have been forced to cease use of their household water because PFAS have contaminated their water

---

[15] *Id.*

SECOND AMENDED COMPLAINT - 38

supply.

142.    Plaintiffs took, and continue to take, delivery of a substitute water supply out of necessity to avoid consumption of PFAS contaminated water caused by Manufacturer Defendants' AFFF.

143.    Manufacturer Defendants knew and/or reasonably should have known that the manufacture, sale, distribution, and intended use of AFFF would release toxic PFAS into the environment, including the soil, groundwater, and household water consumed by Plaintiffs.  Thus, Manufacturer Defendants, through their development, manufacturing, marketing, sale, and/or distribution of AFFF and/or the toxic PFAS components used in AFFF, proximately caused Plaintiffs' injuries by contaminating their groundwater and household water supplies, which they then ingested.

**PFAS ARE USED IN AQUEOUS FILM FORMING FOAM (AFFF)**

144.    PFAS are synthetic carbon chain compounds that contain large amounts of the element fluorine and are not naturally occurring in the environment.  As used in this Complaint, the term "PFAS" includes all PFAS and their precursors, derivatives, and/or salts used in the AFFF used at FS33 which contaminated Plaintiffs' water supplies and property, including *inter alia*, PFOA, PFOS, PFBA, PFBS, PFHxA, PFHxS, PFPeA, PFHpA, PFNA, PFDA, PFDS, PFUnA, PFDoA, and PFTrA.

145.    PFAS are used in firefighting foam known as "aqueous film forming foam," commonly referred to as "AFFF."

146.    AFFF is used to extinguish fires that involve petroleum or other flammable liquid because PFAS are resistant to heat, oil, grease, and water.

147.    3M AFFF, which is produced through a 3M process called electrochemical fluorination, or ECF, contained toxic PFAS components including PFOS.  AFFF formulations purchased and/or manufactured by Tyco and other Manufacturer Defendants are synthesized through telomerization and contain toxic PFAS components including PFOA.  Both processes include formulations containing chemicals that can break down into other toxic PFAS components.

148.   Manufacturer Defendants each manufactured, sold, and/or distributed AFFF that contained toxic PFAS components that was subsequently used, released, and/or discharged by Defendant Fire District at FS33.

149.   Manufacturer Defendants chose to include and/or distribute toxic PFAS components as ingredients in the AFFF sold and distributed to AFFF users, including Defendant Fire District at FS33, despite the availability of other technologically feasible, practical, and effective alternatives that would have reduced or mitigated Plaintiffs' exposure to toxic PFAS.

150.   Manufacturer Defendants knew or should have known that the AFFF, and its toxic PFAS components, sold, and/or distributed to users of AFFF, including Defendant Fire District, for use at fire stations, including FS33, would be released into the environment and contaminate neighboring groundwater and household water supplies, including Plaintiffs' household water.

151.   Manufacturer Defendants knew that their harmful and defective product, AFFF containing toxic PFAS components, would be used as intended by fire departments, including Defendant Fire District, for various purposes including, but not limited to, training for firefighting, testing firefighting equipment, actual firefighting, and use in hangar sprinkler fire suppressant systems.  Manufacturer Defendants also knew or should have known such use would cause the AFFF to drain into the ground and eventually migrate to and contaminate the groundwater beneath and adjacent to fire stations, such as FS33, including neighboring properties owned and/or occupied by Plaintiffs.

152.   Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

///

153.    AFFF and other Class B fluorine-containing firefighting foams have been stored and used for fire suppression of flammable liquid fires, fire training, and flammable vapor suppression at fire-fighting training facilities, including FS33.

154.    AFFF concentrate containing PFAS is stored in above-ground storage tanks, underground storage tanks, and nonstationary containers.  To use AFFF stored in this manner, the concentrate is mixed with water to make a liquid foam solution.  The foam solution is then aerated at the nozzle, yielding finished foam that is then ready to be applied to a fire.

155.    AFFF is designed to coat fire, blocking its oxygen supply and creating a barrier to extinguish vapors.  A film also forms to smother the fire after the foam has dissipated.  Thousands of gallons of foam solution may be applied during a single AFFF release or discharge.

156.    AFFF has been released into the environment, including, on information and belief, at locations impacting Plaintiffs' properties and property interests, through a variety of practices and mechanisms including: low volume releases of foam concentrate during storage, transfer, or equipment calibration; moderate volume discharge of foam solution for apparatus testing; and high-volume, broadcast discharge of foam solution for fire training, fighting, suppression, and prevention.

157.    Toxic PFAS components have been and continue to be detected in private wells and other areas bordering FS33.

**PFAS, Including PFOA and PFOS, Threaten Human Health**

158.    Humans absorb toxic PFAS components contained in AFFF when they consume AFFF contaminated household water.  PFAS then bioaccumulate in the body, primarily in the bloodstream, kidneys, and liver.

159.    Toxic PFAS are absorbed, at a minimum, through the gastrointestinal tract, bioaccumulating in the body, and are then distributed to the organs through the blood, which in turn alters the structure and function of the body.  The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies,

and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies.  Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

160.    PFAS are extremely persistent and bioaccumulate[16] in the human body. Even short-term exposure to PFAS results in a body burden that persists for years that can increase and biomagnify[17] with continued exposure.  Accumulation of toxic PFAS inside the body for a continued period alters body structures and increases the risk of illness, disease, and/or disease process in the exposed individual.

161.    In 2009, the US EPA issued Provisional Health Advisories "to assess potential risk from exposure to [PFOS and PFOA] through drinking water," setting provisional lifetime health advisory levels of 400 ppt for PFOA and 200 ppt for PFOS.  No sampling was required until 2012.

162.    In May 2016, the US EPA issued lower health advisories for PFOA and PFOS warning that drinking water containing PFAS above a combined value of 70 ppt for PFOA and PFOS poses risks of adverse human health effects.  The US EPA announced the Health Advisories on May 19, 2016, and published them in the Federal Register on May 25, 2016.

163.    According to US EPA, health risks associated with PFAS include "developmental effects to fetuses during pregnancy or to breast-fed infants (*e.g.*, low birth weight, accelerated puberty, skeletal variations), cancer (*e.g.*, testicular, kidney), liver effects (*e.g.*, tissue damage), immune effects (*e.g.*, antibody production and immunity), and

---

[16] Bioaccumulation is a process which occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism or excretion.
[17] Biomagnification is a process which occurs when concentration of a substance in organisms tissue increases as the substance travels up the food chain.

SECOND AMENDED COMPLAINT - 42

1    other effects (*e.g.*, cholesterol changes)."[18]

2    164.    The US EPA projects that in humans, PFOS have a half-life of 5.3 years,

3    PFOA have a half-life of 2.3-3.8 years, and PFHxS have a half-life of 8.5 years.[19]  Because

4    of these extended half-lives, the US EPA expects that "continued exposure could increase

5    body burden to level(s) that would result in adverse outcomes."[20]

6    165.    Studies show association between increased PFOA and PFOS levels in

7    blood and increased risk of several adverse health effects, including high cholesterol levels,

8    changes in thyroid hormone, ulcerative colitis (autoimmune disease), and pre-eclampsia (a

9    complication of pregnancy that includes high blood pressure), as well as kidney and

10    testicular cancer.

11    166.    The US EPA classified PFOA and PFOS as having suggestive evidence of

12    carcinogenic potential in humans.[21]

13    167.    The US EPA cited reports from the Organization for Economic Co-

14    operation and Development (hereinafter "OECD")[22] in the May 2016 Health Advisories.

15    168.    The OECD found that, for mammalian species, PFOA and its salts caused

16    cancer in rats and adverse effects on the immune system in mice.  In addition, PFOA and

17    its salts can display reproductive or developmental toxicity in rodents at moderate levels

18    of exposure, and moderate to high systemic toxicity in rodents and monkeys following

19

20

---

21    [18] EPA, *Lifetime Health Advisories and Health Effects Support Documents for

22    Perfluorooctanoic Acid and Perfluorooctane Sulfonate* (May 26, 2016),
https://www.govinfo.gov/content/pkg/FR-2016-05-25/html/2016-12361.htm.

23    [19] A half-life is the amount of time it takes for fifty percent of a contaminant to leave the
body.

24    [20] EPA, *Long-Chain Perfluorinated Chemicals (PFCs) Action Plan*, pp. 1, 8-9 (Dec. 30,
2009), https://www.epa.gov/sites/default/files/2016-

25    01/documents/pfcs_action_plan1230_09.pdf.

26    [21] EPA, *Health Effects Support Document for Perfluorooctanoic Acid (PFOA)*, p. 3-159
(May 2016), https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-
plain.pdf; EPA, *Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)*,

27    p. 3-114 (May 2016), https://www.epa.gov/sites/default/files/2016-
05/documents/pfos_hesd_final_508.pdf.

28    [22] OECD is an international intergovernmental organization that convenes, discusses
issues of concern, and works to respond to international problems.

long-term exposure via the oral route.[23]   OECD also concluded in a Hazard Assessment that PFOS are persistent, bioaccumulative, and toxic to mammalian species.[24]

169.    The US EPA also cited findings from a C-8 Science Panel and Health Project in the May 2016 Health Advisory for PFOA.  The C-8 Science Panel was formed out of a settlement related to PFOA contamination of groundwater from a manufacturing facility in West Virginia.  The C-8 Health Project is the largest study evaluating human exposure and health endpoints for PFOA.  The study included more than 65,000 people in Mid-Ohio Valley communities who were exposed to PFOA for longer than one year.  The C-8 Science Panel consisted of three epidemiologists and its goal was to assess the links between PFOA and numerous diseases.  The C-8 Science Panel carried out studies of exposure and health studies between 2005 and 2013; information was gathered through questionnaires and blood samples from the individuals who had PFOA contaminated drinking water and previously published studies.[25]

170.    The C-8 Science Panel found probable links between exposure to PFOA and six diseases: high cholesterol, ulcerative colitis, thyroid disease, testicular cancer, kidney cancer, and pregnancy-induced hypertension.[26]

171.    The U.S. Agency for Toxic Substances and Disease Registry (hereinafter "ATSDR") stated in its 2018 draft Toxicological Profile that studies suggest associations between PFOA exposure and liver damage, pregnancy-induced hypertension, increased cholesterol, increased risk of thyroid disease, increased risk of asthma, increased risk of decreased fertility, and low birth weight, as well as testicular and kidney cancers.

---

[23] OECD, *Report of an OECD Workshop on Perfluorocarboxylic Acids (PFCAs) and Precursors*, p. 21, (June 18, 2007).

[24] OECD, *Hazard Assessment of Perfluorooctane Sulfonate (PFOS) and Its Salts*, p. 5 (Nov. 21, 2002), https://hpvchemicals.oecd.org/ui/handler.axd?id=fb613ab6-eaaf-48a8-bad7-568cb48d630c.

[25] See *Information on the C-8 (PFOA) Medical Monitoring Program Screening Tests*, http://www.c-8medicalmonitoringprogram.com/docs/med_panel_education_doc.pdf (last accessed Mar. 12, 2025).

[26] *Id.*; see also Emile Boyer *et al.*, *Prenatal Exposure To Persistent Organic Pollutants And Molar-Incisor Hypomineralization Among 12-Year-Old Children In The French Mother-Child Cohort Pelagie* (Aug. 15, 2023), https://www.sciencedirect.com/science/article/abs/pii/S0013935123010319.

172.    Studies have also linked PFAS exposure to deteriorated dental health, with notably higher levels of tooth decay in exposed individuals, particularly in children.[27]

173.    In response, in October 2021, the Washington Department of Ecology stated that PFAS compounds meet the definition of hazardous and/or environmental pollution under RCW 70A.305 (Model Toxics Control Act).  Less than two years later, prevalence of PFAS contamination in the Hannah Heights Water System caused HCS to declare an emergency water advisory.[28]

174.    In June 2022, the US EPA established lower drinking water interim health advisory limits ("Health Advisories") for PFOA and PFOS at .004 and .02 ppt, respectively.  At the same time, the US EPA created two additional Health Advisories for GenX and PFBS at 10 and 2,000 ppt respectively.[29]  The US EPA set the Interim HALs at levels below which PFOS and PFOA can be measured using current analytic methods, meaning that the mere detection of PFOS or PFOA in a water provider's system results in an exceedance of the new levels.

175.    In January 2024, the US EPA proposed to list nine PFAS, including PFOA and PFOS, as hazardous constituents under Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq*., enabling the US EPA to require investigation and cleanup of these PFAS at facilities that treat, store, or dispose of hazardous wastes.  The US EPA also proposed to expand the agency's authority in a way that would allow it to address thousands of other PFAS that have not formally been found to be hazardous.

176.    In April 2024, the US EPA finalized MCLs under the federal Safe Drinking Water Act ("SDWA") for PFOA and PFOS of 4 ppt each and for PFHxS, PFNA, and HFPO-DA ("GenX") at 10 ppt each; it also regulated mixtures of PFNA, PFHxS, PFBS,

---

[27] R. Constance Wiener *et al*., *Perfluoroalkyls/polyfluoroalkyl substances and dental caries experience in children, ages 3-11 years, National Health and Nutrition Examination Survey, 2013-2014* (July 8, 2019), https://pubmed.ncbi.nlm.nih.gov/31286520/.

[28] San Juan County, *Hannah Heights Water System Tests Positive for PFAS* (Apr. 15, 2023), https://www.sanjuancountywa.gov/CivicAlerts.aspx?AID=1369.

[29] EPA, *Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances*, 87 Fed. Reg. 36848 (June 21, 2022).

SECOND AMENDED COMPLAINT - 45

and/or GenX under a unitless threshold called a "Hazard Index," based on the combined concentrations of those four PFAS.

177.    Also in April 2024, the US EPA designated PFOA and PFOS as hazardous substances under CERCLA.  The designations took effect on July 8, 2024.  The US EPA is currently considering whether to designate several other PFAS and/or entire categories of PFAS as hazardous substances under CERCLA.

178.    PFAS accumulate in the environment for years, the most common PFAS have half-lives between two and eight years, with some remaining in the environment for longer.  The chemical design of PFAS makes them highly mobile and persistent in the environment allowing them to invade and contaminate water supplies for decades.  When humans are exposed to, and ingest, toxic PFAS components, they suffer a significantly increased risk of illness, disease, and/or disease processes.

179.    Manufacturer Defendants knew or reasonably should have known about the health effects from toxic PFAS components, as discussed above, at the time they developed, manufactured, marketed, sold, and/or distributed AFFF, and/or its toxic PFAS components, to fire departments across the United States, including Defendant Fire District, for use at fire stations around the country, including FS33.

**PFAS, including PFOA and PFOS, Contaminated the Household Water Supply**
**Relied Upon by Plaintiffs**

180.    PFAS are chemically and biologically stable and resistant to environmental degradation.  The US EPA projects that PFOS have an environmental half-life in water of over 41 years, and PFOA have an environmental half-life in water of over 92 years.  PFOA and PFOS are also considered to be resistant to degradation in soil. [30]

///

///

///

---

[30] EPA, *Long-Chain Perfluorinated Chemicals (PFCs) Action Plan*, p. 1 (Dec. 30, 2009), https://www.epa.gov/sites/default/files/2016-01/documents/pfcs_action_plan1230_09.pdf.

181.    PFAS are particularly mobile in soil and water, readily absorbed into groundwater, and can migrate across long distances.[31]

182.    Additionally, PFOA are persistent and have caused adverse effects in laboratory animals and humans, including cancer and developmental and systemic toxicity. PFOS are persistent, bioaccumulative, and toxic to mammalian species.  PFOS are also linked to developmental, reproductive, and systemic toxicity.

183.    Further, PFOA and PFOS are not the only PFAS from AFFF found in Plaintiffs' household water.  Mixtures of PFAS raise the likelihood of additive and synergistic impacts on non-human receptors.  It is likely that one or more other PFAS possess similar characteristics and pose similar threats of adverse health effects.

184.    The structure of toxic PFAS components in AFFF are highly mobile and persistent in the environment allowing them to invade and contaminate water supplies for decades as the environment, and humans, are exposed to, and ingest, the toxic PFAS components which causes increased risk of illness, disease, and/or disease processes.  The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies.

185.    Upon information and belief, Manufacturer Defendants knew or should reasonably have known about the environmental effects from PFAS at the time they developed, manufactured, marketed, sold, and/or distributed AFFF, and its toxic PFAS components, to fire departments across the country, including Defendant Fire District, and used at fire stations throughout the United States, including FS33.

///

///

---

[31] EPA, *Addressing Challenges of PFAS: Protecting Groundwater and Treating Contaminated Sources* (Sept. 20, 2021), https://www.epa.gov/sciencematters/addressing-challenges-pfas-protecting-groundwater-and-treating-contaminated-sources#:~:text=For%20example%2C%20PFAS%20are%20mobile%20and%20can,be%20important%20underground%20sources%20of%20drinking%20water.&text=Following%20a%20contamination%20incident%20or%20release%2C%20these,move%20through%20the%20unsaturated%20zone%20into%20groundwater.

**Defendants Knew of AFFF Toxicity and Failed to Provide Notice**

186.    Instructions, labels, and material safety data sheets (hereinafter "MSDS") were provided with AFFF and the toxic PFAS components used in AFFF sold by Manufacturer Defendants.  Such information, intended to advise users of the consequences of a products use, did not fully describe the health and environmental hazards of AFFF which Manufacturer Defendants knew or should have known at the time of distribution.

187.    Manufacturer Defendants knew of these health and environmental hazards for years and, at significant times, failed to disclose this information about the toxic PFAS components in their AFFF and actively hid such information from their customers.  .

### *1940s and 1950s: Early Warnings About the Persistence of AFFF*

188.    The development of this family of PFAS began with Defendant 3M in the 1940s.  At that time, 3M's Central Research Laboratory worked with Joseph H. Simons, a scientist at Penn State University, who had developed and patented a process of preparing fluorine compounds through electrochemical fluorination ("ECF").

189.    In 1945, 3M acquired Simons' ECF patents.  Three years later, 3M's Central Research developed fluorinated compounds that could be used for commercial applications.  During that time, 3M scientists continuously researched and created new fluorochemicals; in the words of one researched, "[a]lmost every day we made a new molecule which had never been made on the face of the earth before."[32]

190.    In 1947, 3M created its fluorochemical program.  Within four years, it began selling PFOA to Defendant DuPont.

191.    The persistence and contaminating nature of fluorosurfactants contained in AFFF products were understood prior to their commercial application.  Simons reported that fluorosurfactants produced by the process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the

---

[32] Neil MacKay, *A Chemical History of 3M: 1933-1990*, https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1365.pdf (last accessed Apr. 2, 2025).

molecule.[33]   3M understood that the stability of carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural processes in the environment.[34]

192.   3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.[35]

193.   The thermal stability of 3M's fluorosurfactants was also understood prior to commercial production.  Simons' patent application discloses that the fluorosurfactants produced by the ECF process were thermally stable at temperatures up to 750° C (1382° F).  Additional research by 3M expanded the understanding of the thermal stability of perfluorocarbon compounds.[36]

194.   A 1956 study at Stanford University concluded that PFAS manufactured by 3M bind to proteins in blood.[37]

195.   Nowhere in any MSDS for any of Manufacturer Defendants' AFFF is information on the thermal stability of those products disclosed or its impacts on the environment.  Failure to disclose knowledge of the stability of the toxic PFAS components and fluorosurfactants used in AFFF products to customers constitutes a failure to warn just how indestructible the toxic PFAS components in Manufacturer Defendants' AFFF are when released to unprotected water sources and result in injury to those exposed, including Plaintiffs.

///

///

---

[33] Simons, J.H., *Fluorocarbons and Their Production,* Fluorine Chemistry, 1(12): 401-422 (1950), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf.
[34] *Id*.
[35] *Per- and Polyfluoroalkyl Substances: Hearing Before the Committee on Oversight and Reform, Subcommittee on Environment*, United States House of Representatives (Sept. 10, 2019) (statement of Lori Swanson, Former Minnesota Att'y Gen.), https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf.
[36] Bryce, T.J., *Fluorocarbons - Their Properties and Wartime Development*, FluorineChemistry, 1(13): 423-462 (1950).
[37] Nordby, G.L. and Luck, J.M., *Perfluorooctanoic Acid Interactions with Human Serum Albumin*, 219 J. Biol. Chem. 399 (1956).

*1960s: AFFF's Environmental Hazards Are Made Clear*

196.    By the early 1960s, Defendant 3M understood that PFAS are stable, persist in the environment, and do not degrade.

197.    Defendant DuPont company scientists issued internal warnings about the toxicity associated with their PFOA as early as 1961.

198.    One 3M employee wrote in 1964: "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon."[38]  Thus, 3M knew by the mid-1960s that its surfactants were immune to chemical and biological degradation in soil and groundwater.

199.    3M also knew by 1964 that fluorocarbon carboxylic acids and fluorocarbon sulfonic acids, when dissolved, dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions.  Later studies by 3M on the adsorption and mobility of FC-95 (the potassium salt of PFOS) and FC-143 (the ammonium salt of PFOA) in soils indicated very high solubility and mobility for both compounds.[39]

200.    DuPont Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

201.    In or about 1966, the United States patented AFFF as a method for extinguishing liquid hydrocarbon fires and other fires at military bases, airports, oil refineries, and firefighting training facilities.

202.    In 1969, by command of the Navy Department and Marine Corps, DOD issued military specification MIL-F-24385 (amended subsequently), requiring AFFF liquid concentrate to contain either 3% or 6% PFAS.  In MIL-F-24385, DOD refers to 3% AFFF concentrate as "Type 3" and to 6% AFFF concentrate as "Type 6".

///

---

[38] Bryce, H.G., *Industrial and Utilitarian Aspects of Fluorine Chemistry*, (1964), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

[39] 3M, *Technical Report Summary re: Adsorption of FC 95 and FC143 on Soil* (Feb. 27, 1978), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

203.     In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water (either 97% or 94%, respectively). AFFF concentrates contain about 60–90% water and have a fluorine content of about 0.3–1.8%.

204.     AFFF and other Class B fluorine-containing firefighting foams have been stored and used for fire suppression of flammable liquid fires, fire training, and flammable vapor suppression at military installations and fire-fighting training facilities in the United States, including at FS33.

205.     By at least the end of the 1960s, additional research and testing performed by Defendants 3M and DuPont indicated that fluorosurfactants, including PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.  Such data was not published, provided to government entities, as required by law, or otherwise publicly disclosed.

### 1970s: International Studies Provide Evidence of Environmental and Health Risks

206.     Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."[40]

207.     In 1970, after conducting tests on a 3M product containing PFAS, it was observed that the product was "highly derogatory to marine life" and the entire test program had to be abandoned to avoid severe local stream pollution.[41]

208.     An internal memorandum from 3M in 1971 states that "the thesis that there is 'no natural sink' for fluorocarbons obviously demands some attention."[42]   Hence, 3M

---

[40] *Per- and Polyfluoroalkyl Substances: Hearing Before the Committee on Oversight and Reform, Subcommittee on Environment*, United States House of Representatives (Sept. 10, 2019) (statement of Lori Swanson, Former Minnesota Att'y Gen.), https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf.

[41] Correspondence from S.I. Kalkstein, President of Chemical Concentrates Corporation, to the National Fire Protection Association, *Effects of "Light Water"* (June 15, 1970), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1083.pdf.

[42] Memorandum from H.G. Bryce to R.M. Adams, *Ecological Aspects of Fluorocarbons*, 3M (Sept. 13, 1971), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1088.pdf.

understood at the very least that the fluorosurfactant used in its AFFF would, in essence, never degrade once released into the environment.

209.    By the mid-1970s, Defendant 3M and Ansul (and possibly other Manufacturer Defendants) had an intimate understanding of the persistent nature of PFAS. A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFOS, a result 3M characterized as "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely fluorinated."[43]

210.    In 1975, independent toxicologists Drs. Warren Guy and Donald Taves reported that a then-unknown organic fluorine compound had been found widely in human blood samples from different blood banks.  The toxicologists contacted Defendant 3M about "potential sources" for the chemical, but 3M "pleaded ignorance" and claimed to adopt a position of "scientific curiosity and desire to assist in any way."  The toxicologists ultimately published their research in Science, identifying the organic fluorocompounds as "derived from commercial products."[44]

211.    Also in 1975, 3M scientist Richard Newmark authored an internal company report stating that the fluorine compound found in blood bank samplings "resembled most closely" PFOS, a chemical manufactured by and used in Defendant 3M's AFFF product.[45]

212.    In 1976, a team headed by 3M scientists Don Hagan and Jon Belisle confirmed that "Guy and Taves' spectra reflects the presence of PFOS."[46]

213.    Despite early warnings of the toxic, persistent, and bioaccumulative nature of PFOS and PFOA, these chemicals began to be used in a product that would be released in large quantities directly into the environment whenever used: firefighting foam.

214.    In 1977, Ansul authored a report titled "Environmentally Improved AFFF," which acknowledged that releasing AFFF into the environment could pose potential

---

[43] Technical Report Summary, August 12, 1976 [3MA01252037].
[44] See *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, Dkt. 2601 at 15.
[45] *Id.*
[46] *Id.*  Notably, in 1981, Jon Belisle published an article in Science stating that the compound that was the subject of the Guy and Taves article was not man-made, but rather a naturally occurring substance.

negative impacts to groundwater quality.[47]  Ansul wrote: "The purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristic . . . improvements [to AFFF formulations] are desired in the environmental area, *i.e.*, development of compositions that have a reduced impact on the environment without loss of fire suppression effectiveness."[48]  Thus, Ansul knew by the mid-1970s that the environmental impact of AFFF needed to be reduced, yet there is no evidence that Ansul (or any other Manufacturer Defendant) ever pursued such initiatives.

215.    A 1978 study by 3M on PFOS and PFOA confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

216.    In 1978, DuPont received information from 3M about elevated and persistent fluorine levels in workers exposed to PFOA.  Based on this information, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects could be attributed to PFOA exposure.  This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

217.    By 1979, Defendant DuPont's blood sample data indicated workers exposed to PFOA had significantly higher incidence of health issues than unexposed workers.  Defendant DuPont did not report this data or the results of its workers' health analysis to any government agency or community.

218.    In 1979, a 3M scientist recognized that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."[49]

---

[47] Ansul Co., *Final Report: Environmentally Improved AFFF*, N00173-76-C-0295 (Dec. 13, 1977), https://apps.dtic.mil/sti/tr/pdf/ADA050508.pdf.
[48] *Id.*
[49] Correspondence from R.A. Nelson to M.T. Case, *Fluorochemical Chronic Toxicity*, Riker Laboratories (Jul. 6, 1979), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1212.pdf.

219.   That same year, Defendants 3M and DuPont discussed 3M's discovery of PFOA in the blood of its workers and came to the same conclusion that there was "no reason" to notify the EPA of its finding.[50]

220.   In the 1970s, Defendant 3M began a major program to review personnel handling of fluorochemicals.  This monitoring confirmed that fluorochemicals could bioaccumulate in humans.  Once again, this data was not published, provided to government entities, as required by law, or otherwise publicly disclosed.

### 1980s and 1990s: Evidence of AFFF Health Risks Compound

221.   By the end of the 1980s, additional research and testing performed by Manufacturer Defendants, including at least Defendants 3M and DuPont, indicated that elevated incidence of certain cancers and other adverse health effects in exposed individuals.  Research concluded that adverse health effects caused by toxic PFAS components contained in Manufacturer Defendants' AFFF include elevated liver enzymes and birth defects among workers exposed to such toxic PFAS materials, including at least PFOA.  Such data was not published, provided to government entities, as required by law, or otherwise publicly disclosed.

222.   In 1980, Defendant DuPont internally confirmed that PFOA "is toxic," that PFOA accumulates in human tissue, and that "continued exposure is not tolerable."  Not only did DuPont know PFOA accumulates in human tissue, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

223.   In 1981, Defendant DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia.  DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect and one a nostril and eye defect.[51]

---

[50] Memorandum from R.A. Prokop to J.D. Lazerte, *Disclosure of Information on Levels of Fluorochemicals in Blood*, DuPont (Jul. 26, 1979), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf.
[51] C-8 Blood Sampling Results, http://tiny.cc/v8z1mz.

224. A subsequent rat study in 1982 showed PFOA crossing the placenta and presence in the maternal blood – Defendant DuPont concealed the results of these internal studies from its own plant workers.[52]

225. No later than 1984, Defendant DuPont was aware that PFOA is also biopersistent.

226. Defendant DuPont has long been aware that toxic PFAS components it released, and was releasing, from its facilities were leaching into groundwater used for public drinking water.

227. In 1984, after obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

228. DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

229. Defendant DuPont chose not to use either available technologies or replacement materials, despite full knowledge of PFOA's toxicity.

230. During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image and corporate liability."

231. They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

232. In 1984, Defendant 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers, leading one of the company's medical officers to warn in an internal memo:

---

[52] EPA, *Consent Agreement and Proposal Final Order to Resolve DuPont's Alleged Failure to Submit Information Under TSCA*, at 109 (Dec. 14, 2005) https://www.epa.gov/sites/default/files/2013-08/documents/eabmemodupontpfoasettlement121405.pdf.

SECOND AMENDED COMPLAINT - 55

[W]e must view this present trend with serious concern. It is certainly possible that . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body.[53]

233. A 1985 literature survey by Navy Operational Support Center (NOSC) concluded that "usage of AFFF and the disposal of AFFF-laden wastewater have the potential for an adverse impact on the environment -- these foams are potentially toxic due to the fluorocarbons and surfactants." NOSC referenced toxicity studies showing impacts on a variety of organisms in the 1970s and 1980s. It also analyzes several studies conducted by 3M in 1980 showing AFFF's lethality at various concentrations across a 96-hour timeframe. NOSC concluded these "earlier studies demonstrated that a wide range of toxic concentrations exist for a variety of organisms."[54]

234. In 1988, a 3M environmental specialist wrote in an internal memo, "I don't think it is in 3M's long-term interest to perpetuate the myth that these fluorochemical surfactants are biodegradable. It is probable that this misconception will eventually be discovered, and when that happens, 3M will likely be embarrassed, and we and our customers may be fined and forced to immediately withdraw products from the market."[55]

235. A 1997 MSDS for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other perfluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. On information and belief, the MSDS for 3M's AFFF products did not provide similar warnings or information.

236. In 1998, 3M revealed PFOS was in the blood of the general population, but it assured the public PFOS was safe. Internally, however, 3M's Manager of Corporate

---

[53] Memorandum from D.E. Roach to P.F. Riehle, *Organic Fluorine Levels*, 3M (Aug. 31, 1984), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf.

[54] S.M. Salazar, *Toxicity of Aqueous Film-Forming Foams to Marine Organisms: Literature Review and Biological Assessment*, Naval Oceans Systems Center, Technical Document 825 (1985).

[55] Email from E. Reiner to Mike Pike *et al.*, *FC-129 Biodegradability* (Dec. 30, 1988), https://www.documentcloud.org/documents/5981811-PTX1351/?mode=document#document/p1/a500336.

Toxicologist, Dr. John Butenhoff, wrote about the need to "replace PFOS-based chemistry as these compounds [are] VERY persistent and thus insidiously toxic." Dr. Butenhoff considered a safe level of PFOS in blood to be 1.05 ppb.[56]

237. By the end of the 1990s, additional research and testing performed by Manufacturer Defendants using toxic PFAS components in their AFFF, including at least Defendants 3M, DuPont, and Dynax Corporation, indicated that at least one such toxic PFAS component, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver, and pancreatic). Once again, this data was not published, provided to government entities, as required by law, or otherwise publicly disclosed.

***Manufacturer Defendants Hid a Known Toxic Chemical from the Government and the Public***

238. The potential loss of tremendous profits drove Manufacturer Defendants to engage in a deliberate campaign to influence the science related to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

239. A key priority of an internal 3M committee was to "[c]ommand the science" concerning the "exposure, analytical, fate, effects, human health, and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

240. In exchange for providing grant money to friendly researchers, Defendant 3M obtained the right to review and edit the drafts of papers on PFAS and sought control over when or whether these papers were published at all.

241. From the late 1960s to 2002, Defendant 3M manufactured and/or sold AFFF containing PFOS under the brand name "Light Water."

///

---

[56] Deena Winter, *Toxic: 3M knew its chemicals were harmful decades ago, but didn't tell the public, government*, Minnesota Reformer (Dec. 15, 2022), https://minnesotareformer.com/2022/12/15/toxic-3m-knew-its-chemicals-were-harmful-decades-ago-but-didnt-tell-the-public-government/.

242.    From the 1970s onward, 3M conducted over a thousand studies on the properties of PFOS but never disclosed those studies to US EPA or its consumers.  Before 1998, 3M had released only 84 such studies.  After 1998, Defendant 3M made long overdue disclosures of over 1,200 additional studies, leading the US EPA to fine 3M $1.5 million for withholding reports that "produced valuable, previously unreported information that will help the scientific community to better understand the presence of toxic substances in the environment."[57]

243.    Under pressure from the US EPA, on May 16, 2000, Defendant 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, that it had developed more than fifty years earlier.[58]

244.    Defendant 3M, who was the predominant manufacturer of AFFF, ceased production of PFOS based AFFF in 2002.[59]

245.    An US EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to US EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term. [PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree."[60]

246.    In contrast, 3M's news release insisted that "our products are safe" while extolling their "principles of responsible environmental management" as driving the cessation of production.[61]

///

---

[57] EPA, *3M Company Settlement* (Apr. 25, 2006), https://www.epa.gov/enforcement/3m-company-settlement.
[58] 3M Press Release, *3M Phasing Out Some of Its Specialty Materials* (May 16, 2000), https://money.cnn.com/2000/10/23/companies/3m/scotchgard.htm.
[59] Fire Fighting Foam Coalition, *AFFF Update* (May 2002), https://static.ewg.org/reports/2020/pfas-firefighter-timeline/2002-03afffupdate.pdf?_ga=2.69475472.1253861871.1649070681-2123137255.1639662520.
[60] EPA, *Phaseout of PFOS*, Internal Memorandum (May 16, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1691.pdf.
[61] 3M Press Release, *3M Phasing Out Some of Its Specialty Materials* (May 16, 2000), https://money.cnn.com/2000/10/23/companies/3m/scotchgard.htm.

247.   As part of the multi-year phase-out, Defendant 3M engaged in a damage-control misleading campaign to influence its customers' reactions to the phase-out and encourage them to continue buying its toxic, and therefore useless, PFOS- and PFOA-based products during the phase-out period and, on information and belief, possibly longer.

248.   Manufacturer Defendants had a duty, which they breached, to notify the US EPA when it had reason to believe that a substance or mixture—such as PFAS—presented a substantial risk of injury to health or the environment.

249.   Manufacturer Defendants treated these foam formulations as proprietary information and did not disclose the specific chemical ingredients of their formulations to government agencies or the public.

250.   Manufacturer Defendants understood how stable the fluorinated surfactants used in AFFF are when released into the environment from its first sale to a customer, yet they failed to warn their customers or provide reasonable instruction on how to manage the wastes generated from their products.

251.   Before about 1983, neither the containment measures were listed in MSDSs, nor were the dangers to health or the environment inherent in AFFF disclosed in the instructions, warning labels, or product packaging for AFFF.

252.   Between about 1983 and the present, the MSDSs and SDSs, instructions, warning labels, and product packaging did not fully describe or adequately warn users of AFFF health and environmental risks, or of all precautions they should take—risks and precautions that Manufacturer Defendants knew or should have known existed and/or were necessary.

253.   In 2001, the Firefighting Foam Coalition (hereinafter "FFFC"), an AFFF trade group, was formed to advocate for AFFF's continued viability.  Defendant DuPont, which as described above had extensive knowledge about the toxicity associated with PFAS, was a member of the FFFC along with many other AFFF manufacturers, including Ansul, Buckeye, Chemguard, and Dynax.  Through their involvement in the FFFC, as well as a variety of other trade associations and groups, the FFFC and Manufacturer Defendants

shared knowledge and information regarding PFOA.   The FFFC and Manufacturer Defendants worked together to protect AFFF from scrutiny including close cooperation regarding messaging about PFOA's toxicological profile.

254.   The FFFC's efforts were designed to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning about the harms of PFAS to human health and the environment.   The FFFC regularly published newsletters and attended conferences bolstering AFFF.   Coordinated efforts between FFFC and Manufacturer Defendants were meant to dispel concerns about the impact toxic PFAS components in their AFFF have on the environment and human health.   The FFFC and Manufacturer Defendants worked in concert to conceal the risks they knew arose out of use of their AFFF, and its toxic PFAS components, from the government and public.

255.   Defendant DuPont's Epidemiology Review Board (hereinafter "ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.   For example, in 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis for [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."[62]

256.   In 2006, the US EPA initiated a "PFOA Stewardship Program" with an ultimate goal of phasing out the use of AFFF Products containing PFOA by 2015.   The US EPA asked "the eight major companies in the PFASs industry" to commit to eliminate PFOA from their products by 2015.   These companies were Arkema, Asahi Glass Co. (predecessor to AGC, Inc.), BASF, Clariant, Daikin, 3M, Old DuPont, and Solvay Solexis. The PFOA Stewardship Program was widely publicized, and all eight companies made public promises to phase out their use of PFOA by 2015.

///

---

[62] Memorandum to Michael Kaplan, *Epidemiology Review Board and PFOA*, DuPont (Feb. 24, 2006), https://static.ewg.org/files/ERB_February2006.pdf.

257.    In 2009, the US EPA announced a Long-Chain Perfluorinated Chemicals Action Plan that discussed the agency's intent to go beyond the PFOA Stewardship Program and pursue the elimination of "long-chain PFCs" (which include PFOA and other PFAS chemicals) from all manufacturers' products, as well as other goals related to eliminating many other types of PFAS.

258.    Manufacturer Defendants were aware of the US EPA's PFOA phase-out program and took steps during the phase-out period to replace their existing foam products, which used PFAS with eight or more carbon atoms, such as PFOA ("Long Chain PFAS"), with products that used fewer than eight carbon atoms ("Short Chain PFAS").

259.    On information and belief, Manufacturer Defendants had reason to believe their Long Chain PFAS-containing foam products would be unmarketable after the 2015 phase-out deadline, yet, Manufacturer Defendants continued to market, sell, and provide instructions for the use of Long Chain AFFF Products throughout the PFOA Stewardship Program and other US EPA actions aimed at eliminating PFAS use, in order to offload inventory that was or would soon be rendered valueless by regulatory pressure and environmental and health concerns, despite knowing of their toxic components and the associated consequences.

260.    On information and belief, existing stocks of PFOA and PFOS may still be used, and PFOA and PFOS may be contained in some imported articles.

261.    In the 1970s, Manufacturer Defendants began making AFFF that included shorter carbon chain PFAS.  Those other PFAS also are highly soluble, persistent, bioaccumulative, and toxic to humans.  Short Chain PFAS also accumulate in blood and other tissues and will persist indefinitely in the environment, posing threats to the environment and health.  Short Chain PFAS are also difficult to remove from the environment and can break through carbon filtration systems, possibly more easily than Long Chain PFAS.

262.    On information and belief, Manufacturer Defendants knew AFFF and other PFAS-containing products developed with Short Chain PFAS were still harmful and

1    viewed such products as a stopgap measure to enable their continued sales even as they

2    understood the industry was moving towards PFAS-free foams.

3          263.    On information and belief, there are at least 24 firefighting foam products

4    currently on the market that do not contain PFAS, including products manufactured by

5    Angus Fire LTD., Auxquimia, S.A.U., Dafo Fomtec AB, and The Solberg Company, which

6    are economically and technologically feasible.

7          264.    In 2018, the State of Washington passed the Firefighting Agents and

8    Equipment law, which prohibits any person, local government, or state agency from

9    discharging or otherwise using, for training purposes, Class B firefighting foam that

10   contains intentionally added PFAS chemicals.  RCW 70A.400.010.  Before this law was

11   passed, however, fire districts like Defendant Fire District, were permitted to discharge

12   class B (AFFF) firefighting foam for training purposes.

13                    ***Manufacturer Defendants' AFFF Was Released at FS33***

14         265.    AFFF containing toxic PFAS components were sold and/or distributed by

15   Manufacturer Defendants to Defendant Fire District for use at FS33.    Thereafter,

16   Manufacturer Defendants' AFFF was stored, used, released, discharged, and/or disposed

17   of by Defendant Fire District at FS33, located at 3189 Bailer Hill Road, San Juan County,

18   WA, 98250, which caused the contamination of Plaintiffs' household water supplies,

19   resulting in their exposure to and ingesting of toxic PFAS components.  PFAS have been

20   detected in samples collected from the Hannah Heights Water System (HHWS).  Plaintiffs

21   consumed contaminated water from the HHWS for years without knowledge of the dangers

22   of PFAS because of Manufacturer Defendants' failure to act on decades of knowledge

23   proving its toxicity.

24         266.    Defendants' conduct constitutes an invasion of Plaintiffs' legally protected

25   interests in the form of past, present, and future increased risk of illness, disease, and/or

26   disease process from their significant exposure to toxic PFAS components from

27   Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary

28   diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or

1  disease process.

2      267.    Concentrations of toxic PFAS components found in the HHWS have been

3  caused by the releases of Manufacturer Defendants' AFFF, and its toxic PFAS

4  components, by Defendant Fire District to the environment at FS33.  As was reasonably

5  foreseeable by Manufacturer Defendants, fire training, fire response, and other uses of

6  AFFF occurred on, and/or resulted in discharges to, open ground and stormwater systems

7  around FS33.  As was reasonably foreseeable, Defendants' AFFF, including toxic PFAS

8  components, migrated into and through the soil and groundwater and, from there, migrated

9  to and contaminated household water supplies in the HHWS.

10      268.    The toxic PFAS were absorbed, at a minimum, through Plaintiffs'

11  gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their

12  bodies through their blood, which in turn altered the structure and function of their bodies.

13  Thereby, Plaintiffs have been, and continue to be, significantly exposed to PFAS

14  contaminated household water.  The PFAS contamination of Plaintiffs' household water is

15  therefore directly caused by Defendants' manufacture, sale, distribution, and/or discharge

16  of AFFF and its toxic PFAS components.

17      269.    It was, and is, reasonably foreseeable to Manufacturer Defendants that

18  Plaintiffs would be placed at increased risk of illness, disease, and/or disease processes by

19  consuming PFAS-contaminated household water resulting from releases of AFFF

20  containing toxic PFAS components by Defendant Fire District at FS33.

21      270.    Manufacturer Defendants' internal memorandums proclaimed that "no

22  reason" existed to alert outside agencies or the public to the toxic characteristics of PFAS

23  despite repeated, consistent internal studies concluding PFAS are toxic, bioaccumulate,

24  biomagnify, and are persistent in the environment and in human tissue.  Manufacturer

25  Defendants' failure to act on such information made it practically certain that a known

26  toxic substance, PFAS, would continuously stream into the environment and be consumed

27  by Plaintiffs.  As a direct and proximate cause of these failures, Plaintiffs have suffered

28  and will continue to suffer injuries in the form of an increased risk of illness, disease, and/or

1   disease process.

2       271.    Manufacturer Defendants knowingly manufactured, sold, and/or distributed

3   a dangerous and defective product, AFFF containing toxic PFAS components, failed to

4   provide sufficient warnings to protect bystanders, such as Plaintiffs, and failed to recall or

5   redesign their products when they took them off the market and/or knew them to present a

6   hazard to human health.

7       272.    Non-PFAS based products were available for fire suppression that would

8   not have led to contamination of Plaintiffs' household water supply.

9       273.    Upon information and belief, Manufacturer Defendants control or

10  controlled a substantial share of the market in the United States for AFFF containing toxic

11  PFAS components and are jointly responsible for the contamination of the groundwater,

12  soil, and household water supplies in the HHWS and causing the injuries Plaintiffs have

13  and will suffer.

14      274.    Defendants' conduct constitutes an invasion of Plaintiffs' legally protected

15  interests in the form of past, present, and future increased risk of illness, disease, and/or

16  disease process from their significant exposure to toxic PFAS components from

17  Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary

18  diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or

19  disease process.

20      275.    As a direct and proximate result of Manufacturer Defendants' AFFF, and

21  its toxic PFAS components contaminating groundwater in and around FS33, Plaintiffs

22  have, and will continue to, suffer injuries in the form of significant exposure to toxic PFAS

23  components resulting in an increased risk of illness, disease, and/or disease process causing

24  the pecuniary loss of the present medically necessary testing for the early detection of latent

25  illness, disease, or disease process.  The toxic PFAS were absorbed, at a minimum, through

26  Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the

27  organs of their bodies through their blood, which in turn altered the structure and function

28  of their bodies.  Because of Plaintiffs' significant exposure to toxic PFAS components from

1    Manufacturer Defendants' AFFF and consequent increased risk of illness, disease, and/or

2    disease process, they have suffered and will continue to suffer the present pecuniary harm

3    of the costs for medically necessary diagnostic testing for the early detection of such illness,

4    disease, and/or disease processes.

5    **The Use, Storage, Release, Discharge, and Disposal of PFAS from AFFF at FS33**

6    **Has Contaminated Plaintiffs' Properties and Property Rights**

7        276.    FS33 is part of San Juan Island Fire and Rescue, which is governed by San

8    Juan County Fire District No. 3, chartered in May of 1959 under RCW Title 52 (Defendant

9    Fire District).[63]  Defendant Fire District began purchasing and using AFFF, and its toxic

10   PFAS components, at FS33 in the 1970s.

11       277.    FS33 was originally constructed in the early 1970s and was approximately

12   480 sq ft.  In 1983, FS33 was renovated to include a single-story addition of 720 sq ft.

13   Class B AFFF containing PFAS was stored at FS33 and used to fight certain types of fires

14   on San Juan Island.[64]

15       278.    Over the following fifty years, Manufacturer Defendants' AFFF containing

16   toxic PFAS components were discharged and disposed of by Defendant Fire District in and

17   around FS33.  This discharge and disposal of AFFF, and its toxic PFAS components, has

18   included, but is not limited to, releases and discharges into soil and water pathways that

19   connect to property, wells, and water systems within the Hannah Heights Water System

20   (HHWS).

21       279.    Defendant Fire District personnel used AFFF in training exercises and other

22   activities at FS33.[65]

23   ///

---

[63] San Juan Island Fire Department, *Governance*,
https://www.sjifire.org/about/governance/ (last accessed Mar. 13, 2025).
[64] Memorandum from GeoEngineers Inc. to State of Washington, Department of
Ecology, *Data Review Memorandum Little Mountain Fire Station No. 33* (Nov. 25,
2024).
[65] Manuel Villa *et al.*, *As Wa Tackles PFAS Pollution, Some Worry About 'Piecemeal'
Approach*, Seattle Times (Mar. 25, 2024), https://www.seattletimes.com/seattle-
news/times-watchdog/2-2-million-from-wa-will-help-san-juan-homeowners-deal-with-
pfas-is-it-a-thing-to-come/.

280.    PFAS released by Defendant Fire District have infiltrated the soil and migrated into groundwater and household water supply throughout the HHWS.

281.    Defendant 3M developed, designed, manufactured, marketed, sold, and/or distributed AFFF from approximately 1964 through at least 2002.  Defendant 3M specifically produced the chemical PFOS for use in AFFF and other PFAS-containing products.  For the majority of its business manufacturing and distributing PFAS chemicals to companies for use in AFFF and other PFAS-containing products, 3M was the sole US manufacturer of PFOS.  Defendant 3M's PFOS was used in AFFF purchased for fire training and response at locations throughout the country, including by Defendant Fire District at FS33, where AFFF was released and/or discharged, thereby impacting properties of Plaintiffs.

282.    Defendant Tyco (successor in interest to Ansul) and National Foam developed, designed, manufactured, marketed, sold, and/or distributed AFFF to firefighting training entities, including Defendant Fire District, for use at facilities and other locations throughout the United States, including FS33.  After Tyco acquired Ansul in the 1990s, it continued to produce, distribute, and/or sell Ansul and Ansulite AFFF products.

283.    From at least 1992 until 2016, the releases of PFAS to groundwater through use and handling of Manufacturer Defendants' AFFF by Defendant Fire District during training events and other activities at FS33 is well documented.

284.    Records show that Defendant Fire District purchased 3M's AFFF products, including Ansul and Ansulite products, between 2006 and 2016.  On information and belief, fire drill logs show that Defendant Fire District used AFFF in its training activities as early as 1992.

285.    Defendant Fire District's records are incomplete and likely show AFFF purchased made by other manufacturers.

286.    Washington Department of Health employees found containers of Ansulite 3% inside FS33 as recently as 2023.  Ansulite 3% is a Class B AFFF foam.

287.    Ansul and Ansulite are Tyco brand products.

288.    Ansul and Ansulite products have been documented as containing PFOS.

289.    Well 2 in the HHWS is located approximately 50 feet from FS33, and is immediately adjacent to and downhill from FS33.

290.    Defendant Fire District stored Manufacturer Defendants' AFFF at FS33.

291.    Defendant Fire District used Manufacturer Defendants' AFFF at and around FS33.

292.    Defendant Fire District discharged and disposed of PFAS into the environment, including by spraying, releasing, and placing Manufacturer Defendant' AFFF on land and in water at and around FS33.

293.    On information and belief, from at least 1992 to 2016, Defendant Fire District has conducted AFFF training at FS33.  The training consisted of AFFF application demonstrations, where firefighters would apply the foam "to the ground," "against a wall, tank, or similar object," and "into the air…and allowed to float down onto the fuel." Training guidance also directed Defendant Fire District to set up a simulated fuel spill and/or fire and have the firefighters respond to the location by applying AFFF.

294.    On information and belief, volunteer firefighters recall foam drills occurring at FS33 once or twice a year in the 1990s and 2000s.  Defendant Fire District's training logs document the firefighters' practice applying Class B foam, an AFFF.  A log from 2006 instructs that, "firefighters should demonstrate the application of foam on a mock fuel spill. Each crew should demonstrate (as possible) the three techniques used in foam application." Training included, "set[ting] up a simulated fuel spill and/or fire" and firefighters would "respond to the location" by "trad[ing] off applying AFFF properly."

295.    On information and belief, Defendant Fire District discharged Manufacturer Defendants' AFFF to the soil and groundwater at and around FS33, as was standard practice for such training facilities and other activities.

296.    On information and belief, drill reports specifically mention "foam practice" and "foam operations."  Firefighters practiced by aiming foam at the bushes and

trees within which Well 2 is located.  After the drills, the firefighters cleaned their hoses by running water through them at FS33.  The training logs describing these practices date back until at least 1992.   Logs specifically reference Station 33, the identification used for FS33.

297.    Defendant Fire District's testing, training, exercises, and/or fire response activities occurred on open ground at FS33, causing toxic PFAS waste to drain into soil, groundwater, surface waters, and ditches in and around FS33.[66]   The toxic PFAS components discharged to soil and surface waters have migrated into groundwater and contaminated the groundwater and the HHWS, contaminating Plaintiffs' properties and household water supply.

298.    On information and belief, Manufacturer Defendants' AFFF, and their toxic PFAS components, was discharged to the soil and groundwater at and around FS33.

299.    In 2021, the Washington State Board of Health mandated that Group A water systems, including the HHWS, monitor for PFAS beginning January 2023, requiring the testing to be completed before October of 2024.

300.    On April 3, 2023, samples were collected from two wells in the HHWS that provide household water to Plaintiffs.[67]

301.    The results showed elevated levels in Well 2 of PFOS (2460 ng/L), PFHxS (2900 ng/L), PFOA (146 ng/L), PFNA (221 ng/L), PFBS (572 ng/L), PFHpA (78.4 ng/L), PFHxA (296 ng/L), PFHpS (126 ng/L), PFPeA (143 ng/L), and PFPeS (576 ng/L).[68]

---

[66] Manuel Villa *et al.*, *As Wa Tackles PFAS Pollution, Some Worry About 'Piecemeal' Approach*, Seattle Times (Mar. 25, 2024), https://www.seattletimes.com/seattle-news/times-watchdog/2-2-million-from-wa-will-help-san-juan-homeowners-deal-with-pfas-is-it-a-thing-to-come/.
[67] Anatek Labs, Inc., *Analytical Results Report*, Hannah Heights (Apr. 18, 2023).
[68] *Id*.

302. The Well tested well above the Maximum Contaminant Level (MCL)[69] for PFOA and PFOS (4.0 ng/L), and the MCL for PFNA and PFHxS (10.0 ng/L). The State Action Level (SAL) for PFOS is 15 ng/L, PFOA is 10 ng/L, PFHxS is 65 ng/L, PFNA is 9.0 ng/L, and PFBS is 145 ng/L.[70] The results showed contamination well above the MCL set by the US EPA and the SAL set by the State of Washington.



303. On April 14, 2023, San Juan County HCS received confirmed test results indicating that Well 2 belonging to the HHWS tested positive for high levels of PFAS and declared a state of emergency, directing residents to switch to bottled and/or filtered water immediately.[71]

304. Well 2 provides household water to surrounding households, including those occupied by Plaintiffs. April 2023 test results showed contamination levels 164 times the SAL threshold and were among the highest numbers found in the State of

---

[69] EPA, *PFAS National Primary Drinking Water Regulation* (Apr. 2024), https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_fact-sheet_general_4.9.24v1.pdf.
[70] Washington State Department of Ecology, *Initial Investigation Field Report* (June 2, 2023).
[71] San Juan County Washington, *Hannah Heights System Tests Positive for PFAS*, Health and Community Services (Apr. 15, 2023), https://www.sanjuancountywa.gov/CivicAlerts.aspx?AID=1369.

Washington.[72]

305.    Additional testing performed on May 3, 2023 showed elevated levels of contamination in the "Pitless Adaptor", including PFOA (306 ng/L), PFOS (6750 ng/L), PFHxS (6800 ng/L), PFNA (423 ng/L), PFBS (1030 ng/L), PFHpA (141 ng/L), PFHxA (530 ng/L), PFBA (105 ng/L), PFHpS (245 ng/L), PFPeA (278 ng/L), and PFPeS (1020 ng/L).[73]

306.    Testing levels from the "Upper Fracture Seep" also showed elevated contamination levels, including PFOA (373 ng/L), PFOS (9400 ng/L), PFHxS (7550 ng/L), PFNA (785 ng/L), PFBS (1110 ng/L), PFHpA (189 ng/L), PFHxA (660 ng/L), PFBA (138 ng/L), PFHpS (293 ng/L), PFPeA (323 ng/L), and PFPeS (1180 ng/L).[74]

| COMPOUND | APRIL 2023 CONCENTRATIONS (NG/L) | MAY 2023 CONCENTRATIONS (NG/L) | MAY 2023 (SHALLOW SEEP) CONCENTRATIONS (NG/L) | MCLS (NG/L) |
|---|---|---|---|---|
| PFOS | 2,460 | 6,750 | 9,400 | 4 |
| PFOA | 146 | 306 | 373 | 4 |
| PFHxS | 2,900 | 6,800 | 7,550 | 10 |
| PFNA | 221 | 423 | 785 | 10 |
| GenX | ND (<2) | ND (<2) | ND (<2) | 10 |
| PFBS | 572 | 1,030 | 1,110 | NE |
| PFHxA | 296 | 530 | 660 | NE |
| PFBA | 59.9 | 105 | 138 | NE |
| 6:2 FTS | 57.1 | 112 | NA | NE |
| 4:2 FTS | ND (<2) | ND (<2) | 2.23 | NE |
| 8:2 FTS | 2.08 | 7.05 | 21.2 | NE |
| PFHpA | 78.4 | 141 | 189 | NE |
| PFHpS | 126 | 245 | 293 | NE |
| PFPeA | 143 | 278 | 323 | NE |
| PFPeS | 576 | 1,020 | 1,180 | NE |
| PFDA | ND (<2) | 4.02 | 13.1 | NE |

307.    This subsequent testing revealed even higher levels of contamination, well above the US EPA's MCL and the State of Washington SAL.

308.    Plaintiffs relied on meeting their total water supply requirements through Well 2, located immediately adjacent to and downhill from FS33.  Because PFAS levels in

---

[72] Kelley Balcomb-Bartok, *Hannah Heights Water System Highly Contaminated*, The Journal of the San Juan Islands (May 1, 2023), https://www.sanjuanjournal.com/news/hannah-heights-water-system-highly-contaminated/.
[73] Anatek Labs, Inc., *Hannah Heights – Friday Harbor Sampling* (May 24, 2023).
[74] Anatek Labs, Inc., *Hannah Heights – Friday Harbor Sampling* (May 24, 2023).

1   groundwater at Well 2 exceeded the Health Advisory limits, it was shut down in 2023.

2       309.    Due to the contamination within the HHWS, Plaintiffs have been exposed

3   to and consumed toxic PFAS-laden water.  The toxic PFAS were absorbed, at a minimum,

4   through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed

5   to the organs of their bodies through their blood, which in turn altered the structure and

6   function of their bodies.  As a result, Plaintiffs' risk of illness, disease, and/or disease

7   processes have been increased.  Plaintiffs are now forced to incur the pecuniary loss of the

8   costs associated with diagnostic testing for early detection of such illness, disease, and/or

9   disease processes, which is ongoing.

10  **Specific Release, Discharge, Disposal, and Storage of PFAS-Based AFFF at FS33**

11      310.    Studies have identified groundwater, surface water, and soil pathways

12  where toxic PFAS components in AFFF used on and around FS33 has been, and is,

13  migrating to the HHWS, contaminating Plaintiffs' household water supply.

14      311.    The Initial Site Investigation Field Report from the Washington State

15  Department of Ecology identified one source of PFAS contamination: the Little Mountain

16  Fire Station (FS33).[75]  The report notes that "[h]istorically, firefighting foam used to fight

17  certain types of fires contained PFAS" and that this foam was "discharged in many places,

18  including at the site of a fire, where fire training was conducted, [and] where equipment

19  containing the foam was cleaned out."[76]

20      312.    Subsequent studies have identified groundwater, surface water, and soil

21  pathways where toxic PFAS components from Manufacturer Defendants' AFFF used on

22  FS33 has been, and is currently, migrating to Plaintiffs' groundwater and drinking wells

23  "based on the documented storage and potential use of PFAS-containing aqueous film-

24  forming foam (AFFF)" at FS33.[77]  The sources of contamination in soil and groundwater

25  include spills of AFFF both outside and inside FS33.  Spills of AFFF to the floor inside

---

[75] Washington State Department of Ecology, *Initial Investigation Field Report* (June 2, 2023).
[76] *Id*.
[77] Memorandum of GeoEnginners Inc. to State of Washington, Department of Ecology, *Data Review of Little Mountain Fire Station No. 33*, at 2 (Nov. 25, 2024).

FS33 or residual AFFF on equipment parked inside FS33 "entered the floor drains and septic system, discharging to shallow soil in the drain field."[78]  AFFF covered clothing and equipment laundered and cleaned on-site was also identified as a potential contamination source.[79]

313.     Plaintiffs presently have no alternative groundwater source of household water, and the testing revealed PFOS at levels 600 times higher than the US EPA's MCL and PFOA at 44 times higher.[80]

314.     On information and belief, Manufacturer Defendants have sold and/or distributed AFFF, and its toxic PFAS components, to Defendant Fire District for use at FS33 for approximately fifty years.  Throughout that period, the toxic PFAS components contained in Manufacturer Defendants' AFFF have been released into the environment in significant quantities and migrated into household water supplies supplied by the HHWS.  As a result, Plaintiffs have been exposed to and ingested toxic PFAS components from AFFF, absorbed PFAS into their bloodstream and organs, and presently suffer an increased risk of illness, disease, and/or disease processes that Manufacturer Defendants have known for decades would accompany AFFF releases.

315.     The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies.  Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

---

[78] *Id*. at 8.
[79] *Id*.
[80] Kelley Balcomb-Bartok, *Hannah Heights Continues Struggling with Water Contamination*, The Journal of the San Juan Islands (May 31, 2023), https://www.sanjuanjournal.com/news/hannah-heights-continues-struggling-with-water-contamination/.

**Release, Discharge, and Disposal of PFAS is Contaminating Plaintiffs' Properties & Household Water**

316.    Plaintiffs' household water supply has been contaminated with numerous types of toxic PFAS components contained in Manufacturer Defendants' AFFF released by Defendant Fire District at FS33.

317.    The April 2023 sampling taken from the HHWS discovered that PFOS, PFOA, and other PFAS from Manufacturer Defendants' AFFF pervade the water supply.

318.    Subsequent sampling from different depths detected PFOS, PFOA, and other PFAS from Manufacturer Defendants' AFFF well above the federal and state government established levels.

319.    Between August and October 2024, the Washington State Department of Ecology conducted additional investigations to determine the source of the contamination. The findings confirmed the "presence of PFAS contamination in both soil and groundwater with concentrations exceeding applicable regulatory limits."[81]  The highest levels of PFAS were identified in the areas south of FS33, indicating that, based on the topography of the area, the contamination was likely introduced by a surface release.  "Groundwater samples from both the shallow unconfined aquifer zone and deeper bedrock wells also contained PFAS compounds, particularly PFOS and PFHxS, at concentrations exceeding PCULs. The distribution and magnitude of these impacts support the conclusion that legacy AFFF use at the station is the primary source of PFAS contamination to both soil and groundwater."

320.    It is well documented that AFFF was used in both training and fire response at FS33.[82]

///

---

[81] GeoEngineers, *Bailer Hill Technical Support – Soil and Groundwater Investigation Report*, *supra*, at 22.
[82] Manuel Villa *et al.*, *As Wa Tackles PFAS Pollution, Some Worry About 'Piecemeal' Approach*, Seattle Times (Mar. 25, 2024), https://www.seattletimes.com/seattle-news/times-watchdog/2-2-million-from-wa-will-help-san-juan-homeowners-deal-with-pfas-is-it-a-thing-to-come/.

321.   The highest levels of contamination in the State of Washington have been linked to places where AFFF was used in training exercises, such as FS33.[83]

322.   Past significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF caused by use of Manufacturer Defendants' AFFF by Defendant Fire District at FS33 presents an ongoing health risk to Plaintiffs.

323.   The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies. The toxic PFAS components to which Plaintiffs have been exposed because of their consumption of contaminated household water are biopersistent and so remain in their bodies for years, continuing to alter their bodies' structures and increasing the risk of illness, disease, and/or disease process in Plaintiffs.

**PLAINTIFFS HAVE BEEN INJURED BY DEFENDANTS' ACTIONS**

324.   Plaintiffs hereby incorporate by reference the allegations contained in the proceeding paragraphs of this Complaint as though fully set forth herein.

325.   Plaintiffs' household water supply has been, and continues to be, contaminated by toxic PFAS components from AFFF designed, manufactured, sold, and/or distributed by Manufacturer Defendants and discharged by Defendant Fire District at FS33. AFFF, and its toxic PFAS components, sold and/or distributed by Manufacturer Defendants to Defendant Fire District was used in the manner intended by Manufacturer Defendants, released onto FS33 property, and elsewhere, and thereafter migrated into surrounding groundwater and the HHWS, including the properties of Plaintiffs.

326.   It was reasonably foreseeable by Manufacturer Defendants that PFAS in the AFFF they manufactured and/or distributed would be released into soil, groundwater, water systems, and water supplies by entities to which they sold and/or distributed their AFFF.

---

[83] Manuel Villa *et al.*, *As Wa Tackles PFAS Pollution, Some Worry About 'Piecemeal' Approach*, Seattle Times (Mar. 25, 2024), https://www.seattletimes.com/seattle-news/times-watchdog/2-2-million-from-wa-will-help-san-juan-homeowners-deal-with-pfas-is-it-a-thing-to-come/.

It was further reasonably foreseeable that Manufacturer Defendants' AFFF would migrate into neighboring properties, including Plaintiffs' household water supplies. Plaintiffs' possessory interests in their properties, and therefore the right to withdraw and/or use their household water supply, has been invaded and contaminated, in addition to Plaintiffs' right to bodily integrity.

327. Manufacturer Defendants' AFFF was used at and around FS33 by Defendant Fire District.

328. The discharged and disposed of AFFF containing PFAS spread into the soil, included by Defendant Fire District's spraying, storing, and/or placing Manufacturer Defendants' AFFF on land and in water at and around FS33, and migrated to groundwater.

329. Groundwater from FS33 flows into groundwater which the HHWS – Plaintiffs' source of household water.

330. PFAS contamination from Defendant Fire District's use and release of Manufacturer Defendants' AFFF has migrated, and continues to migrate, through soils into groundwater, physically contaminating and interfering with the real properties occupied by Plaintiffs, along with their water rights and the HHWS water supply wells, impairing Plaintiffs' rights.

331. PFAS have been detected throughout Well 2 with higher concentrations at shallower depths.[84] Widespread contamination caused by Defendants' conduct has, and will continue to, increase Plaintiffs' risk of illness, disease, and/or disease processes.

332. It was reasonably foreseeable that Defendant Fire District would use and release Manufacturer Defendants' AFFF and that it would migrate to the area surrounding FS33 and physically intrude onto, harm, and contaminate Plaintiffs' water supply, and that Plaintiffs, as occupants of residential real property and users of groundwater that supplied private wells in the HHWS, would consume household water contaminated by toxic PFAS components from Manufacturer Defendants' AFFF used by Defendant Fire District at

---

[84] Memorandum of GeoEngineers Inc. to State of Washington, Department of Ecology, *Data Review of Little Mountain Fire Station No. 33*, at 6 (Nov. 25, 2024).

FS33. Therefore, it was reasonably foreseeable that the toxic PFAS components contained in Manufacturer Defendants' AFFF and would cause Plaintiffs to suffer an increased risk of illness, disease, and/or disease processes.

333.   PFAS are toxic and will continue to cause harm to Plaintiffs because they have had significant exposure to PFAS components of AFFF which bioaccumulate, alter bodily structures and the function of the body, and increase their risk of illness, disease, and/or disease process.

334.   Manufacturer Defendants' conduct in designing, manufacturing, selling, and/or distributing AFFF when they knew, through its intended uses, AFFF would release toxic PFAS components into the environment, was wanton, malicious, oppressive, and done without regard for the rights and safety of others, including Plaintiffs, justifying an award of punitive damages.

335.   As a result of Manufacturer Defendants' tortious conduct and the resulting contamination, Plaintiffs consumed PFAS contaminated household water which has caused them to have an ongoing increased risk of illness, disease, and/or disease processes because of such exposure and the present pecuniary loss of presently medically necessary diagnostic testing of latent or unrecognized disease.  To appropriately address such increased risk, Plaintiffs require an award of the cost of a program for medical monitoring for presently needed early detection and/or identification of such illness, disease, and/or disease processes.  Early detection of such illness, disease, and/or disease processes will benefit Plaintiffs and provide Plaintiffs with the ability to detect latent illnesses, diseases, and/or disease processes and obtain early treatment.

336.   Plaintiffs were significantly exposed to PFAS, increasing their risk of illness, disease, and/or disease process and proximately causing the present medical necessity of diagnostic testing for the early detection of latent or misidentified illness, disease, and/or disease process, and the resulting pecuniary loss of the costs of that testing, proximately caused by Defendants' conduct.

///

337.    The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies. Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

338.    Accordingly, Plaintiffs seek compensation for the costs of diagnostic testing for early detection of illness, disease, and/or disease processes beneficial to Plaintiffs, and the costs of administration of that testing, or in the alternative the award of reasonable and necessary costs of the establishment of a court-supervised program of medical monitoring and diagnostic testing through equitable and/or injunctive relief.

339.    Because precise identification of the specific manufacturer of any given AFFF that was the source of toxic PFAS components found in Plaintiffs' household water supply is difficult, and because PFAS combined increase the risk of disease, Manufacturer Defendants are jointly and severally liable for the indivisible injuries which Manufacturer Defendants have caused Plaintiffs to suffer.

340.    Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

341.    Manufacturer Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS to profit from the use of AFFF containing toxic PFAS components, at Plaintiffs' expense, which foreseeably contaminated Plaintiffs' household water supplies, and Manufacturer Defendants' attempts to avoid liability for such contamination of the groundwater.

342.     Enterprise liability attaches to Manufacturer Defendants and the liability of each should be assigned according to its percentage of liability for AFFF containing toxic PFAS components at issue in this Complaint.  Manufacturer Defendants each participate or participated in a state-wide and national market for AFFF containing PFOA and/or PFOS and/or other PFAS for use in AFFF during the relevant time.

343.     Concert of action liability attaches to Manufacturer Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortiously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF containing PFOA and/or PFOS and/or other PFAS for use in AFFF.

344.     Enterprise liability also attaches to Manufacturer Defendants for placing defective products into the stream of commerce.

**PLAINTIFFS HAVE SUFFERED PAST AND PRESENT INJURY IN THE FORM OF THE PECUNIARY LOSS FOR MEDICALLY NECESSARY DIAGNOSTIC TESTING DUE TO THEIR INCREASED RISK OF DISEASE CAUSED BY EXPOSURE TO TOXIC PFAS COMPONENTS CONTAINED IN MANUFACTURER DEFENDANTS' AFFF**

345.     Plaintiffs have suffered past, present, and future injury as a result of their significant exposure to and consumption of household water contaminated with toxic PFAS components contained in Manufacturer Defendants' AFFF used and released by Defendant Fire District at FS33.  Plaintiffs have ingested PFAS-contaminated water which was absorbed into their body tissues and bloodstream.  Because of their past significant exposure, Plaintiffs have suffered past, present, and future increased risk of illness, disease, and/or disease process, including cancer, making it presently medically necessary that they undergo diagnostic testing for early detection of latent illnesses, diseases, and/or disease processes.

346.     PFAS are toxic and carcinogenic to humans.  For decades, Manufacturer Defendants' internal memorandum, outside scientific literature, and regulatory agencies have made clear that exposure to PFAS causes various adverse health effects, including cancer.

347.    On April 10, 2024, the US EPA announced the final National Primary Drinking Water Regulation (NPDWR) for six PFAS to prevent PFAS exposure in drinking water.[85]

348.    The US EPA established legally enforceable levels, called Maximum Contaminant Levels (MCLs), for six PFAS in drinking water: PFOA, PFOS, PFHxS, PFNA, and HFPO-DA as contaminants with individual MCLs, and PFAS mixtures containing at least two or more of PFHxS, PFNA, HFPO-DA, and PFBS using a Hazard Index MCL to account for the combined and co-occurring levels of these PFAS in drinking water.  The US EPA also finalized health-based, non-enforceable Maximum Contaminant Level Goals (MCLGs) for these PFAS.

| Compound | Final MCLG | Final MCL (enforceable levels)[1] |
|---|---|---|
| PFOA | Zero | 4.0 parts per trillion (ppt) (also expressed as ng/L) |
| PFOS | Zero | 4.0 ppt |
| PFHxS | 10 ppt | 10 ppt |
| PFNA | 10 ppt | 10 ppt |
| HFPO-DA (commonly known as GenX Chemicals) | 10 ppt | 10 ppt |
| Mixtures containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS | 1 (unitless) Hazard Index | 1 (unitless) Hazard Index |

349.    Studies have made clear that exposure to PFAS bioaccumulates and results in toxic invasion and persistence in human tissue and bloodstreams, including Plaintiffs' tissue and bloodstreams, and thereby altering the structure of their bodies.

350.    Based on available scientific literature, exposure to toxic PFAS components places Plaintiffs at increased risk of developing several serious illnesses, diseases, and/or

---

[85] EPA, *Per-and Polyfluoroalkyl Substances (PFAS) Final PFAS National Primary Drinking Water Regulation*, https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last visited Apr. 1, 2025).

disease processes.[86]

351.   With early detection and identification, Plaintiffs can seek early treatment and prepare their lives accordingly for the severe consequences of significant exposure to toxic PFAS components.

352.   Defendants did not seek or obtain permission or consent from Plaintiffs before engaging in acts and/or omissions that caused, allowed, and/or resulted in their significant exposure to the known toxic PFAS components contained in Manufacturer Defendants' AFFF released by Defendant Fire District at FS33.

353.   As a proximate result of Defendants' conduct, Plaintiffs have been in the past, are presently, and will continue to be at a significantly increased risk of illness, disease, and/or disease processes, including cancer.  Plaintiffs' increased risk of illness, disease, and/or disease processes makes it reasonably medically necessary to incur, both now and in the future, the cost of diagnostic testing for the early detection of illness, disease, and/or disease processes arising from their significant exposure to toxic PFAS components.  As a proximate result of Defendants' conduct, Plaintiffs have in the past been and are presently at an increased risk of illness, disease, or disease process, including cancer, requiring them to incur, both presently and in the future, the cost of medically necessary diagnostic testing for the early detection of illness, disease process or disease related to exposure to PFAS that were absorbed into their bloodstream and distributed in their bodies resulting in elevated risk.

354.   Plaintiffs have legally protected interests in not being exposed to harmful levels of toxic PFAS components contained in Manufacturer Defendants' AFFF which significantly increase their risk of illness, disease, and/or disease processes.  Plaintiffs also have legally protected interests in avoiding the past, present, and future medical need for expensive diagnostic tests and the pecuniary injury of the costs of medically necessary diagnostic tests.

---

[86] See *Information on the C-8 (PFOA) Medical Monitoring Program Screening Tests*, http://www.c-8medicalmonitoringprogram.com/docs/med_panel_education_doc.pdf (last accessed Apr. 10, 2025).

355.    The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies. Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

356.    The past and ongoing exposure to Manufacturer Defendants' AFFF containing toxic PFAS components and resulting past and ongoing increased risk of illness, disease or disease process associated with exposure to PFAS, has caused the present and future need to incur the cost of medically necessary diagnostic testing for the early detection of disease as a result of Defendant Fire District's use and release of Manufacturer Defendants' AFFF, constituting an invasion of the legally protected interests of Plaintiffs and injury to Plaintiffs.  Plaintiffs would not have the present and future need to incur the cost of the diagnostic testing to determine the presence of illness, disease, or disease process related to exposure to PFAS but for the past and ongoing exposure they have suffered through the conduct of Defendants.

357.    Through Plaintiffs' exposure to Manufacturer Defendants' AFFF released by Defendant Fire District at FS33, PFAS have been absorbed and distributed in Plaintiffs' bodies, thereby altering the structure and function of their bodies.

358.    As a result of the releases of Manufacturer Defendants' AFFF, and its toxic PFAS components, by Defendant Fire District at FS33, Plaintiffs' household water supply has been contaminated.  At relevant times, Plaintiffs relied on that water supply and therefore ingested and absorbed toxic PFAS components into their body tissues through the bloodstream, distributed to the body, including to the organs, such as the kidneys and testicles, and bioaccumulated and particularly absorbed into target organs.  PFAS are dangerous, toxic, carcinogenic, and efficiently absorbed into the blood stream, and easily distributed throughout the human body.  PFAS are readily absorbed through the

gastrointestinal tract and widely distributed in the liver, kidney, lung, testes, brain, spleen, and intestinal mucosa following exposure via the oral route.

359.    As a direct and proximate result of these releases, Plaintiffs have suffered the past, present, and future medical need for diagnostic testing for the early detection and identification of PFAS-related illness, disease, and/or disease processes.   Plaintiffs' exposure has caused the presence of PFAS in their blood and bodily tissues, and subcellular changes in their bodies, some of which are detectable by generally accepted diagnostic testing.

360.    Defendants' conduct constitutes an invasion of legally protected interest of Plaintiffs and has injured Plaintiffs.  Plaintiffs would neither have suffered an increased risk of illness, disease, and/or disease processes nor the consequent ongoing pecuniary injury of the need to incur costs of medically necessary diagnostic testing to identify the presence of illness, disease, and/or disease processes arising from their exposure to toxic PFAS components, but for the past and ongoing exposure they suffer as a proximate result of Defendants' conduct.

361.    But for Defendants' conduct, Plaintiffs would not have suffered significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF.   Such exposure has made it medically reasonably necessary for Plaintiffs to incur the cost of diagnostic testing to monitor and identify latent illness, disease, and/or disease processes. Diagnostic testing is necessary to monitor and identify such illness, disease, and/or disease process, requiring Plaintiffs to suffer pecuniary injury of the cost of such diagnostic testing.

362.    Medical monitoring is recognized as beneficial for early detection where there is an increased risk of disease from exposure to hazardous substances.[87]  The purpose of medical monitoring, in the form of diagnostic testing, is the benefit of early identification of latent or unrecognized illness, disease, and/or disease process.   Early detection is beneficial because treatment can then be obtained to reduce the impacts of the toxic

---

[87] ATSDR, *Final Criteria for Determining the Appropriateness of a Medical Monitoring Program Under CERCLA*, 60 F.R. 38841 (July 28, 1995), https://www.govinfo.gov/content/pkg/FR-1995-07-28/pdf/95-18578.pdf.

exposure.[88]   Medical monitoring is widely accepted as prudent response to toxic exposure.[89]

363.   Generally accepted diagnostic testing procedures exist that make early detection of the toxic effects of PFAS possible.[90]   These programs will benefit Plaintiffs because they will allow for the early detection of latent or unrecognized diseases associated with PFAS.  Identifying cancer and other serious illness, disease, and/or disease processes early allows greater treatment options, improves patient prognoses, and avoids more invasive, risky, and expensive medical interventions.[91]

364.   Periodic diagnostic testing for the early detection of illness, disease, and/or disease process conforms to standards of medical care and are reasonably necessary to ensure that illness, disease, and/or disease processes can be identified early and treated aggressively.  Effective diagnostic tests exist for reliable early detection.  Early detection combined with effective treatment significantly decrease the severity of the illness, disease, disease process, and/or injury.[92]   The present value of costs of such tests is calculable and Plaintiffs will prove such costs at trial.

365.   As an example, Plaintiffs' exposure to PFOA has caused them to suffer an increased risk of thyroid disease.  Monitoring procedures exist for early detection of thyroid disease through thyroid screening, including blood samples to measure the thyroid stimulating hormone and monitoring strategies to assess the progression of the disease,

---

[88] *Id.*

[89] See *Information on the C-8 (PFOA) Medical Monitoring Program Screening Tests*, http://www.c-8medicalmonitoringprogram.com/docs/med_panel_education_doc.pdf (last accessed Mar. 12, 2025); Dept. of Enviro. Health, *Ferland Medical Monitoring Program*, University Of Cincinnati College Of Medicine, https://med.uc.edu/eh/research/projects/fcc/fmmp-history (last accessed Mar. 12, 2025); Enviro Health & Safety, *Pesticide Users Medical Monitoring Program*, University Of Florida, http://www.ehs.ufl.edu/pgorams/ih/pesticide/ (last accessed Mar. 12, 2025); World trade Center Health Program, *About the Program*, https://www.cdc.gov/wtc/ (last accessed Mar. 12, 2025).

[90] *Id.*

[91] American Cancer Society, *Acute Lymphocytic Leukemia Early Detection, Diagnosis, and Types*, https://www.cancer.org/content/dam/CRC/PDF/Public/8671.00.pdf (last accessed Mar. 12, 2025).

[92] World trade Center Health Program, *About the Program*, https://www.cdc.gov/wtc/ (last accessed Mar. 12, 2025)

---

SECOND AMENDED COMPLAINT - 83

1  including testing for anti-thyroid antibodies.

2      366.    As another example, Plaintiffs' exposure to PFAS has caused them to suffer

3  an increased risk of testicular cancer.  Monitoring procedures exist for early detection of

4  testicular cancer through testicular examinations, medical questionnaires, blood testing,

5  and ultrasound procedures.

6      367.    As another example, Plaintiffs' exposure to PFOS has caused them to suffer

7  an increased risk of kidney cancer.  Monitoring procedures exist for early detection of

8  kidney cancer through screening for its presence by medical questionnaires, abdominal

9  examinations, blood sampling, and urine tests.  Additional testing mechanisms including

10 MRIs, CT scans, and ultrasounds allow for the early detection of disease symptoms.

11     368.    As another example, Plaintiffs' exposure to PFOS has caused them to suffer

12 an increased risk of cardiovascular disease resulting from high cholesterol.  Monitoring

13 procedures exists for screening for high cholesterol through medical questionnaires and

14 blood testing at yearly intervals, including additional testing if testing reveals any concerns.

15     369.    As another example, Plaintiffs' exposure to PFOS has caused them to suffer

16 an increased risk of ulcerative colitis.  Monitoring procedures exists for screening for

17 ulcerative colitis through symptom questionnaires, stool sampling, and examinations of the

18 abdomen, rectum, eyes, skin, lung, and back.  If these procedures reveal any abnormalities,

19 the recommended next step would be a colonoscopy or endoscopy.

20     370.    These monitoring procedures are different in type, timing, frequency, and

21 scope from what would normally be recommended in the absence of exposure to toxic

22 PFAS components.  The general unexposed population does not receive procedures of the

23 type, timing, frequency, and scope necessitated by significant exposure to toxic PFAS

24 components from Manufacturer Defendants' AFFF because these tests are designed to

25 detect specific illnesses, diseases, and/or disease processes known to be associated with

26 exposure to toxic PFAS components.

27     371.    The toxic PFAS were absorbed, at a minimum, through Plaintiffs'

28 gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their

bodies through their blood, which in turn altered the structure and function of their bodies. Because of their exposure to toxic PFAS components contained in AFFF, Plaintiffs require presently medically necessary testing to diagnose the warnings signs of PFAS-related illness, disease, and/or disease processes. Early detection of illness, disease, and/or disease processes caused by exposure to toxic PFAS components allows Plaintiffs more treatment options, reduces treatment costs, and increases their chances of an improved outcome. The progression from subcellular and/or other latent alterations in the structure and function of Plaintiffs' bodies to the outward manifestation of serious disease can be delayed for years. If such illness, disease, and/or disease process is permitted to develop until it becomes obvious, patent, or recognized, Plaintiffs will have lost valuable time and disease progress and will likely suffer more severe or long-term health effects and require more costly interventions.

372.    As a direct and proximate result of Defendants' conduct Plaintiffs suffered significant exposure to toxic PFAS components of Manufacturer Defendants' AFFF, which significantly increased their risk of illness, disease, and/or disease processes. Therefore, Plaintiffs have in the past and presently need to incur the cost diagnostic testing to monitor and identify latent illness, disease, and/or disease processes. Through the absorption and distribution in Plaintiffs' bodies, and the associated alteration of the structure and functions of Plaintiffs' bodies, they have suffered an increased risk of disease and pecuniary loss.

373.    Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

///

///

///

IV.    **CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**NUISANCE**

**(All Defendants)**

374.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

375.    Manufacturer Defendants' manufacture, sale, and/or distribution of AFFF containing toxic PFAS components thereof constitutes an unreasonable and substantial interference with the use and enjoyment of Plaintiffs' property interests. Defendant Fire District's discharge of Manufacturer Defendants' AFFF containing toxic PFAS components at FS33 has caused, and continues to cause, an unreasonable and substantial interference with the use and enjoyment of Plaintiffs' properties.

376.    Defendants knew and/or should have reasonably foreseen that the invasion of Plaintiffs' property interests, including their household water supplies, was substantially certain to result from the use of Manufacturer Defendants' AFFF, and its toxic PFAS components, as intended, by Defendant Fire District at FS33. Defendants participated to a substantial extent in the creation, and carrying on, of the nuisance by its actions described above.

377.    Defendants' unreasonable and substantial interference with the use and enjoyment of Plaintiffs' property interests includes but is not limited to the contamination of the HHWS and the resulting significant exposure to household water containing the toxic PFAS components of AFFF.

378.    Defendants' manufacture, sale, distribution, and/or discharge of AFFF, and its toxic PFAS components, constitutes a pattern of continuous and ongoing conduct.

379.    In Washington, a nuisance is an unreasonable interference with another's use and enjoyment of property. *Kitsap County v. Allstate Ins. Co.*, 964 P.2d 1173, 1185

1   (Wash. 1998); *see also* RCW 7.48.120.[93]

2       380.    If an activity is conducted unlawfully and it interferes with someone's use

3   and enjoyment of their property, it is a nuisance per se.  If the activity is conducted lawfully,

4   it becomes a nuisance if it unreasonably interferes with a person's use or enjoyment of

5   property.  *Tiegs v. Watts*, 954 P.2d 877, 879 (Wash. 1998).

6       381.    Even an otherwise legal use of property that unreasonably interferes with a

7   neighbor's use and enjoyment of their property can constitute a nuisance.  *MJD Props.,*

8   *LLC v. Haley*, 358 P.3d 476 (Wash. App. 2015).

9       382.    Conduct constituting a nuisance can include indirect or physical conditions

10  created by the defendant that cause harm.  For continuing nuisance, the claim continues to

11  accrue as long as conduct continues.  *Wallace v. Lewis County*, 137 P.3d 101, 111 (Wash.

12  App. 2006).

13      383.    Toxic PFAS components contaminated, and continue to contaminate and be

14  present in, Plaintiffs' bloodstream and tissue and altering their bodies' structures posing an

15  increased risk of illness, disease, and/or disease processes.  The toxic PFAS were absorbed,

16  at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies,

17  and distributed to the organs of their bodies through their blood, which in turn altered the

18  structure and function of their bodies.  Plaintiffs absorbed PFAS-contaminated water into

19  their body tissue and bloodstream, including to the target organs such as the kidneys,

20  testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or

21  function in a way that leads to an increased risk of latent illness, disease, and/or disease

22  process.

23      384.    Defendant Fire District's releases of Manufacturer Defendants' AFFF has

24  interfered, and continues to interfere, with Plaintiffs' comfortable enjoyment of life and

25

26  _____

[93] Nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act
27  or omission either annoys, injures or endangers the comfort, repose, health or safety of
    others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or
    render dangerous for passage, any lake or navigable river, bay, stream, canal or basin, or
28  any public park, square, street or highway; or in any way renders other persons insecure
    in life, or in the use of property.

property and obstructed and continues to obstruct Plaintiffs' fee use of their properties.

385.    As a result of Defendants' creation of a nuisance, the groundwater supply and Well 2 in the HHWS was, and is, contaminated with toxic PFAS components from Manufacturer Defendants' AFFF.

386.    Defendants' creation of a nuisance has caused Plaintiffs substantial and unreasonable interference with their property rights, including causing significant exposure to household water contaminated with toxic PFAS components from Manufacturer Defendants' AFFF discharged by Defendant Fire District at FS33.

387.    As a direct result of Defendants' conduct, as set forth herein, Plaintiffs' property rights and interests, including their rights to free and the unthreatened use and enjoyment of their property, has been, and will continue to be, interfered with unreasonably.

388.    Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

389.    Defendants' creation of a nuisance caused, is causing, and will continue to cause Plaintiffs a significant increased risk of illness, disease, and/or disease processes due to the presence of toxic PFAS components in Manufacturer Defendants' AFFF in their household water and bodies.

390.    Manufacturer Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of Plaintiffs because Manufacturer Defendants knew or should have known their actions and inactions were substantially certain to interfere with and invade Plaintiffs' property rights and interests. Manufacturer Defendants have known or reasonably should have known for years that their continued design, manufacture, sale, and/or distribution of AFFF containing toxic PFAS

components, was substantially certain to result in releases of PFAS into the soil, groundwater, household water systems, and household water supplies in the HHWS, thereby contaminating Plaintiffs' water supply and exposing them to toxic PFAS components.

391. As a direct result of Defendants' conduct and resulting contamination of Plaintiffs' household water supply, water systems, private wells, and other property, by the toxic PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire District, Plaintiffs have incurred, and will continue to incur, the injuries identified above.

**SECOND CLAIM FOR RELIEF**

**NEGLIGENCE**

**(Manufacturer Defendants)**

392. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

393. At all times relevant, Manufacturer Defendants were in the business of, among other things, manufacturing, selling, and/or distributing AFFF, and its toxic PFAS components.

394. Manufacturer Defendants had a duty to manufacture, market, sell, and/or distribute their AFFF in a manner that avoided contamination of the environment and of household water supplies with known hazardous substances and avoided harm to those who would foreseeably be exposed to its toxic PFAS components.

395. This duty included identifying, designing, using, and/or manufacturing alternatives to the toxic PFAS components used in Manufacturer Defendants' AFFF.

396. Manufacturer Defendants knew or should have known that the manufacture of AFFF containing toxic PFAS components was hazardous to human health and the environment. Knowing of the dangerous and toxic properties of the AFFF, Manufacturer Defendants had the duty to warn of the hazards of ingesting water containing toxic PFAS components.

///

397.    Manufacturer Defendants knew or should have known that the foreseeable storage, use, and/or disposal of AFFF, and its toxic PFAS components, would result in AFFF migrating into groundwater and household water supplies.    Manufacturer Defendants knew or should have known that once AFFF, and its toxic PFAS component, migrated into water it would persist there for decades, causing significant exposure and increasing the risk of illness, disease, and/or disease processes to those exposed.

398.    Manufacturer Defendants further knew or should have known that it was unsafe, unreasonably dangerous, and/or hazardous to manufacture AFFF using toxic PFAS components because it was highly probable that toxic PFAS components would migrate into the environment surrounding fire stations, including FS33, and contaminate the groundwater used to supply household water.

399.    Given the likelihood that sites where Manufacturer Defendants sold and/or distributed AFFF, including to Defendant Fire District for use at FS33, would become contaminated with toxic PFAS components, Manufacturer Defendants had a duty to investigate the extent to which the toxic PFAS components in AFFF released from such sites were likely to migrate and contaminate neighboring properties, including those of Plaintiffs and their household water supplies.

400.    Manufacturer Defendants knew or should have known that the manufacture of AFFF containing toxic PFAS components was hazardous to human health and the environment.

401.    Knowing of the dangerous and hazardous properties of the AFFF, Manufacturer Defendants had the duty to warn of the hazards of ingesting water containing toxic PFAS components.

402.    Plaintiffs were foreseeable victims of the harm caused by Manufacturer Defendants' AFFF containing toxic PFAS components.

403.    Manufacturer Defendants negligently designed, engineered, developed, fabricated, and/or tested AFFF, and its toxic PFAS components, and the associated warnings, or lack thereof, and thereby failed to exercise reasonable care to prevent the

AFFF, and its toxic PFAS components, from presenting an unreasonable risk of harm to human health and the environment and persons who would come in contact with it, including Plaintiffs.

404.    Manufacturer Defendants have, and continue to, engage in discrete acts of negligent design, engineering, development, fabrication, testing, warnings, and/or instructions.  On information and belief, Manufacturer Defendants have not recalled their AFFF and other PFAS-containing products.

405.    Manufacturer Defendants' breaches of their legal duties have caused PFAS to contaminate the groundwater used by Plaintiffs to provide household water.

406.    As a result of Manufacturer Defendants' breaches of their legal duties, the groundwater water, and private wells in the HHWS surrounding FS33 have been, and continue to be, contaminated with toxic PFAS components.

407.    Manufacturer Defendants' negligent manufacture, sale, and/or distribution of AFFF and their negligent misrepresentation and failure to warn, has caused Plaintiffs' significant exposure to toxic PFAS components, resulting in past and ongoing increased risk of illness, disease, and/or disease process to Plaintiffs due to the presence of toxic PFAS components in their household water supply.

408.    The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies.  Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

409.    Manufacturer Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically

1    necessary diagnostic testing for the early detection of latent or unrecognized illness,

2    disease, and/or disease process.

3    410.    Manufacturer Defendants' acts were willful, wanton, or reckless and

4    conducted with a reckless indifference to the rights of Plaintiffs.

5    411.    As a direct result of Manufacturer Defendants' tortious conduct and

6    resulting contamination of Plaintiffs' household water supply, water systems, private wells,

7    and other property, by the PFAS components of Manufacturer Defendants' AFFF,

8    Plaintiffs have incurred, and will continue to incur, the injuries identified herein.

9    ## THIRD CLAIM FOR RELIEF

10    ## NEGLIGENT FAILURE TO WARN

11    ### (Manufacturer Defendants)

12    412.    Plaintiffs incorporate by reference the allegations contained in the

13    preceding paragraphs as if fully set forth herein.

14    413.    At relevant times, Manufacturer Defendants were in the business of, among

15    other things, manufacturing, selling, and/or distributing AFFF containing toxic PFAS

16    components.

17    414.    This cause of action is brought pursuant to Washington State statutory law

18    to including, but not limited to, Chapter 7.72 RCW.

19    415.    Under Washington State law, "a product manufacturer is subject to liability

20    . . . if the claimant's harm was proximately caused by the negligence of the manufacturer

21    in that the product was not reasonably safe as designed or not reasonably safe because

22    adequate warnings or instructions were not provided." RCW 7.72.030(1).

23    416.    Although RCW 7.72.030(1) expresses a negligence liability standard, the

24    Washington State Supreme Court has held that "[t]he adequacy of a manufacturer's

25    warnings are to be measured under Washington's strict liability test." *Taylor v. Intuitive*

26    *Surgical, Inc.*, 389 P.3d 517, 528 (Wash. 2017) (applying strict liability standard

27    established in Restatement (Second) of Torts § 402A (Am. Law Inst. 1965) to failure to

28    warn claim).

417.    A product is not reasonably safe due to inadequate warnings or instructions if "at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate."  RCW 7.72.030(1)(b).

418.    Where a manufacturer learned, or where a reasonably prudent manufacturer should have learned, about a danger connected with the product after it was manufactured, and did not then provide adequate warnings or instructions, the product is not reasonably safe.  RCW 7.72.030(1)(c).

419.    In such a case, the manufacturer is under a duty to issue warnings or instructions in the manner of a reasonably prudent manufacturer in the same or similar circumstances.  This duty is satisfied if the manufacturer exercises reasonable care to inform product users.  *Id.*

420.    As manufacturers, sellers, and/or distributors of a commercial product, Manufacturer Defendants had a duty to provide full and adequate instructions and warnings about the health or injury risks posed by their products.

421.    Manufacturer Defendants knew or should have known that the foreseeable storage, use, and/or disposal of the AFFF, and its toxic PFAS components, that they manufactured, sold, and/or distributed to fire stations, including FS33, would enter the water supply, persist there for decades, cause risks to human health and the environment, and injure Plaintiffs.

422.    At the time of the design, manufacture, sale, and/or distribution of the AFFF, Manufacturer Defendants knew or should have known of the dangerous properties of the toxic PFAS components in their AFFF.

423.    At significant times Manufacturer Defendants knew of AFFF' toxic PFAS components and dangerous properties yet failed to provide sufficient warnings to the users of AFFF that use and release of their AFFF, and/or its toxic PFAS components, into the

environment would result in the contamination of groundwater, household water supplies, and significant health risks to those who consumed such PFAS contaminated water supplies, including Plaintiffs.

424. Manufacturer Defendants breached the duties owed and failed to provide adequate warnings to the users of the dangers to human health and the environment if the toxic PFAS components contained in Manufacturer Defendants' AFFF was permitted to contaminate the groundwater and water supplies.

425. Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the use and release of AFFF containing toxic PFAS components at FS33.

426. Had Manufacturer Defendants provided adequate warnings, the users of their AFFF would have either not used AFFF, or taken measures to store, use, and/or dispose of AFFF in a manner that reduced or eliminated groundwater and household water contamination from the toxic PFAS components contained in AFFF at FS33.

427. As a direct and proximate result of Manufacturer Defendants' failure to warn against the likelihood of contamination from their AFFF, the HHWS and Plaintiffs' household water supply has been contaminated with toxic PFAS components.

428. As a direct and proximate result of Manufacturer Defendants' failure to warn of the environmental and health impacts caused by their AFFF, and the release thereof, the groundwater and household water supplies in the HHWS became contaminated with toxic PFAS, which Plaintiffs then ingested.

429. The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies. Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

430.    Manufacturer Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

431.    Manufacturer Defendants' failure to provide adequate warnings or instructions renders Manufacturer Defendants' AFFF, and its toxic PFAS components, a defective product.

432.    As a result of Manufacturer Defendants' manufacture, sale, and/or distribution of a defective product, AFFF containing toxic PFAS components, Manufacturer Defendants are strictly liable for injuries suffered by Plaintiffs.

433.    Manufacturer Defendants' acts were willful, wanton, and/or reckless and conducted with a reckless indifference to the rights of Plaintiffs.

434.    As a direct result of Manufacturer Defendants' tortious conduct and resulting contamination of Plaintiffs' household water supply, water systems, private wells, and other property, by the toxic PFAS components of Manufacturer Defendants' AFFF, Plaintiffs have incurred, and will continue to incur, the injuries identified herein.

### FOURTH CLAIM FOR RELIEF

### DEFECTIVE PRODUCT DEFECTIVE DESIGN

### (Manufacturer Defendants)

435.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

436.    This cause of action is brought pursuant to Washington State statutory law, including, but not limited to, Chapter 7.72 RCW.

437.    Under Washington law, "a product manufacturer is subject to liability…if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate

1    warnings or instructions were not provided." RCW 7.72.030(1).

2    438. "A product is not reasonably safe as designed, if, at the time of manufacture,

3    the likelihood that the product would cause the claimant's harm or similar harms, and the

4    seriousness of those harms, outweighed the burden on the manufacturer to design a product

5    that would have prevented those harms, and the adverse effect that an alternative design

6    that was practical and feasible would have on the usefulness of the product." RCW

7    7.72.030(1)(a).

8    439. At relevant times, Manufacturer Defendants were in the business of, among

9    other things, manufacturing, selling, and/or otherwise distributing AFFF containing toxic

10   PFAS components.

11   440. It was foreseeable that AFFF, and its toxic PFAS components, that

12   Manufacturer Defendants manufactured, sold, and/or distributed, would enter the HHWS

13   and the household water supply of Plaintiffs and cause exposure to toxic PFAS components

14   of AFFF and significant increased risk of illness, disease, and/or disease processes.

15   441. Alternative designs and formulations of AFFF without toxic PFAS

16   components were available, technologically feasible, practical, effective, and would have

17   reduced and/or prevented the reasonably foreseeable risks of harm to Plaintiffs.

18   442. Further, design, formulation, manufacture, sale, and/or distribution AFFF

19   containing PFAS components that were so toxic, mobile, and persistent in the environment

20   was unreasonably dangerous.

21   443. AFFF manufactured, sold, and/or distributed by Manufacturer Defendants

22   was defective in design because the foreseeable risk of harm posed by the AFFF could have

23   been reduced or eliminated by the adoption of a reasonable alternative design. Because

24   Manufacturer Defendants have failed to do so, they continue to sell and distribute an

25   unreasonably dangerous product, AFFF containing toxic PFAS components.

26   444. Manufacturer Defendants' AFFF containing toxic PFAS components was

27   defective at the time of manufacture, and thus, at the time they left Manufacturer

28   Defendants' control.

SECOND AMENDED COMPLAINT - 96

445.    As a result of Manufacturer Defendants' manufacture, sale, and/or distribution of a defectively designed product, AFFF containing toxic PFAS components, the groundwater and household water supply in private wells within the HHWS became contaminated with toxic PFAS components.  Plaintiffs consumed and ingested such PFAS contaminated water which resulted in absorption of the toxic PFAS components in Manufacturer Defendants' AFFF into their bloodstream and tissue.  Such absorption caused the structures of Plaintiffs' bodies to be altered, subjecting them to a significant increased risk of illness, disease, and/or disease processes.

446.    As a result of Manufacturer Defendants' design, formulation, manufacture, sale, and/or distribution of a defective product, Manufacturer Defendants are strictly liable for the injuries suffered by Plaintiffs.

447.    The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies.  Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

448.    Manufacturer Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

449.    Manufacturer Defendants' acts were willful, wanton, and/or reckless and conducted the design, manufacture, sale, and/or distribution of PFAS-based AFFF with a reckless indifference to the rights of Plaintiffs.

450.    As a direct result of Manufacturer Defendants' tortious conduct and

1    resulting contamination of Plaintiffs' household water supply, water systems, private wells,

2    and other property, by the toxic PFAS components of Manufacturer Defendants' AFFF,

3    Plaintiffs have incurred, and will continue to incur, the injuries identified herein.

### FIFTH CLAIM FOR RELIEF

### TRESPASS

### (All Defendants)

7    451.    Plaintiffs incorporate by reference the allegations in the preceding

8    paragraphs as if fully set forth herein.

9    452.    In Washington, "[a] trespass is an intrusion onto the property of another that

10   interferes with the other's right to exclusive possession." *Phillips v. King Cty.*, 968 P.2d

11   871, 876 n.4 (Wash. 1998). The intrusion occurs when the actor causes something else to

12   enter property, including land and water. See *Arment v. Bickford*, 247 P. 952 (Wash. 1926)

13   (holding water right a sufficient property interest for trespass).

14   453.    Liability exists for an intentional entry into land in the possession of another

15   "irrespective of whether he thereby causes harm to any legally protected interest of the

16   other." *Lavington v. Hillier*, 510 P.3d 373, 382 (Wash. App. 2022). An unauthorized

17   tangible presence on the property of another constitutes a trespass. *Id*.

18   454.    For continuing trespass, the claim continues to accrue as long as tortious

19   conduct continues. *Woldson v. Woodhead*, 149 P.3d 361, 363–64 (Wash. 2006).

20   455.    Manufacturer Defendants took intentional actions and made intentional

21   omissions in the manufacture, sale, and/or distribution of AFFF, and its toxic PFAS

22   components, which in their natural course, caused the trespass of PFAS contamination of

23   Plaintiffs' household water supply. Manufacturer Defendants deliberate and intentional

24   design, manufacture, marketing, sale, and/or distribution of AFFF that contained toxic

25   PFAS components made it natural, inevitable, and a substantial certainty that releases of

26   such AFFF from FS33 would migrate into and contaminate the household well water

27   supplies in the surrounding area, including the HHWS.

28   456.    Defendant Fire District's intended to use Manufacturer Defendants' AFFF

at and around FS3, resulting in an unauthorized tangible presence on the properties of Plaintiffs.

457.    Plaintiffs in no way consented or provided permission to Defendants' conduct which inevitably resulted in AFFF containing toxic PFAS components entry onto and contamination of their residential real property, which remained and remains on Plaintiffs' properties without permission or invitation, express or implied.  As a result, Plaintiffs were exposed to and consumed toxic PFAS components which have invaded their bodies, bloodstream, and tissue, as a result of Defendant Fire District's intentional use of Manufacturer Defendants' AFFF at FS33.

458.    These trespasses occurred in the past, are currently occurring, will continue to occur.

459.    The physical intrusion of toxic PFAS components contained in AFFF designed, manufactured, sold, and/or distributed by Manufacturer Defendants and released by Defendant Fire District at FS33 onto and into the environment, including the properties of Plaintiffs, causing injury thereto.  The household water they relied on, and consumed, has been, and is, contaminated with toxic PFAS components.  As a result, Plaintiffs have suffered significant exposure to PFAS and an increased risk of illness, disease, and/or disease processes.

460.    The toxic PFAS contaminating Plaintiffs' properties and their water supplies would not have been, and would not be, present but for Defendants' acts and omissions.  Further, Plaintiffs would not have consumed household water containing toxic PFAS but for Defendants' conduct.  The physical intrusion of Manufacturer Defendants' toxic PFAS components onto property occupied by Plaintiffs has caused injuries including an increased risk of illness, disease, and/or disease processes.

461.    The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies. Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream,

including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

462.    Defendants actually and proximately caused the PFAS contamination of Plaintiffs' residential real property and household water supply.  Consumption of such PFAS contaminated household water has resulted in their bodies, bloodstreams, and tissue absorbing toxic PFAS components which continue to alter their bodies' structures.

463.    Defendants' conduct was a substantial factor in the design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, used as intended, and discharged, released, and/or disposed of at and around FS33, which migrated into Plaintiffs' residential real properties and household water supplies, along with Plaintiffs' bodies structures, bloodstream, and tissue.

464.    Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests, and to the HHWS household water they paid for and had a right to use, in the form of past, present, and future trespass to their property and past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

465.    As a direct result of Defendants' conduct and resulting contamination of Plaintiffs' household water supply, water systems, private wells, and other real property by the toxic PFAS components of Manufacturer Defendants' AFFF released by Defendant Fire District, Plaintiffs have incurred, and will continue to incur, the injuries identified herein.

///

///

///

///

SECOND AMENDED COMPLAINT - 100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SIXTH CLAIM FOR RELIEF**

**UNJUST ENRICHMENT**

**(Manufacturer Defendants)**

466.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

467.    Plaintiffs have conferred a benefit upon Manufacturer Defendants, by bearing the burden of the PFAS contaminated soil, groundwater, water systems, and household water that would not have been and would not be present but for Manufacturer Defendants' tortious conduct.  Because Manufacturer Defendants have refused to take responsibility for the costs of the pervasiveness, persistence, and toxicity of Manufacturer Defendants' AFFF, and its toxic PFAS components, they have saved substantial sums of money they otherwise should have been required to expend to avoid the injuries suffered by Plaintiffs.  Instead, Plaintiffs have been forced to suffer the pecuniary injury of obtaining medically reasonably and necessary diagnostic testing and monitoring because of their increased risk of illness, disease, and/or disease processes on their own.

468.    Manufacturer Defendants knew or should have known of the benefit that Plaintiffs have conferred and continue to confer upon them.  Manufacturer Defendants profited from the manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components.  Manufacturer Defendants continued to profit from the manufacture, sale, and/or distribution of such products for decades after they knew or should have known of the environmental and health risks they posed.  Therefore, Manufacturer Defendants had knowledge of the profit and benefits they were receiving, and continue to receive, at the expense of the injuries suffered by Plaintiffs.

469.    Manufacturer Defendants knew or should have known that their AFFF, and its toxic components, would cause injuries to Plaintiffs and their property rights and interests, which Manufacturer Defendants did not bear financial cost to correct.  This conduct resulted in a benefit to Manufacturer Defendants, and they have not been required to shoulder the burden of the injury Plaintiffs have suffered as a result of Manufacturer

Defendants' acts and/or omissions.

470.    Manufacturer Defendants have accepted and/or retained the benefit Plaintiffs have conferred, and continue to confer, upon them under circumstances, such that it is inequitable for them to retain the benefit gained without payment to Plaintiffs. Manufacturer Defendants profited from the manufacture and/or sale of AFFF, and its toxic PFAS components, at the expense of Plaintiffs health, and continued to do so long after they were aware of the environmental and health risks of their AFFF products. Manufacturer Defendants have failed to redesign or recall their products to prevent further release of their AFFF, and its toxic PFAS components, into the environment and Plaintiffs' soil, groundwater, water systems, and household water supply.  Plaintiffs have been injured by this conduct and are unable to bear the burden of Manufacturer Defendants' conscious and tortious wrongful acts and omissions alone.

471.    Manufacturer Defendants' enrichment is both unjust under the circumstances and as between these parties.  *Puget Sound Security Patrol, Inc. v. Bates*, 396 P.3d 709, 717 (Wash. App. 2017).  Plaintiffs have sustained damages as a direct result of Manufacturer Defendants' acts and/or omission, including, *inter alia*, failing to recall their products, and instead have profited from those sales.

472.    It is inequitable for Plaintiffs to suffer the injuries caused by Manufacturer Defendants' actions and omissions when Manufacturer Defendants knew, should have known, and/or disregarded the risk that their AFFF, and its toxic PFAS components, was highly mobile, persistent, toxic, bioaccumulative, and likely to be released into Plaintiffs' water supply through its intended use.

473.    Through Manufacturer Defendants' actions and inactions at the expense of Plaintiffs, Manufacturer Defendants have been unjustly enriched.

474.    The Court should award as a remedy the expenditures saved, and the profits obtained by Manufacturer Defendants at the expense of Plaintiffs.

///

///

**SEVENTH CLAIM FOR RELIEF**

**BATTERY**

**(Manufacturer Defendants)**

475.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if they were fully set forth herein.

476.    Manufacturer Defendants' intentional tortious conduct has caused, is causing, and will continue to cause harmful and offensive contact with Plaintiffs.

477.    As a result of Manufacturer Defendants' tortious conduct, releases of toxic PFAS components in AFFF into ground and household water supplies have foreseeably migrated into the HHWS and exposed Plaintiffs to household water that contained toxic PFAS components.  Toxic PFAS components consumed by Plaintiffs were absorbed into their bloodstream and body tissues and continue to alter their bodies' structures which constitutes harmful and offensive contact.

478.    Manufacturer Defendants' intentional tortious conduct caused bodily harm to Plaintiffs in a way not justified by their apparent wishes or by any privilege, and the contact was in fact harmful and/or against Plaintiffs' will.

479.    Manufacturer Defendants' intentional tortious conduct included:

-    the sale of AFFF containing toxic PFAS components to be used, as intended, in a manner that would inevitably cause contamination of household water which would be consumed by persons using that household water including Plaintiffs;

-    concealment of Manufacturer Defendants' studies and decades of knowledge that AFFF, and its toxic PFAS components, chemical characteristics made them substantially certain to harm Plaintiffs who were exposed to, and contacted by, PFAS unknowingly, without permission, and against their will;

-    continuous manufacture, sale, and/or distribution of AFFF containing toxic PFAS components when Manufacturer Defendants were aware PFAS are toxic and highly mobile and persistent in the environment;

-    eschewing misinformation denying scientific certainty about the toxicity of the

toxic PFAS components contained in their AFFF in order to continue manufacturing, selling, and/or distributing such products; and

- refusal to redesign and/or recall AFFF containing toxic PFAS components, which they admitted was harmful despite being aware it would continue to be used, and therefore, contaminate water supplies, and contact Plaintiffs.

480.    Manufacturer Defendants lacked any privilege or consent to cause harmful and offensive contact with Plaintiffs by the toxic PFAS components of their AFFF they knew would be released into the environment, contaminate household water supplies, and expose Plaintiffs to PFAS contaminated water supplies without their consent.

481.    Manufacturer Defendants' contact was harmful because it altered the structure, form, and/or physical condition and function of Plaintiffs' bodies, thereby increasing their risk of suffering from a PFAS-related illness, disease, and/or disease processes.

482.    The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies. Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

483.    Manufacturer Defendants' contact with Plaintiffs was offensive, in that contact with PFAS-contaminated water is offensive to a person with reasonable sense of personal dignity.  Such contact would offend the ordinary person and not one unduly sensitive as to his personal dignity.  Manufacturer Defendants' contact was therefore unwarranted by the social usages prevalent at the time and place at which it was inflicted.

484.    Manufacturer Defendants' actions constituted constructive intent to injure; their intent to injure may be inferred from their conduct, which was likely to threaten the safety of others and was so reckless or manifestly indifferent to the consequences when

Manufacturer Defendants were practically certain their acts and omissions would cause harmful and offensive contact.

485.    Manufacturer Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

486.    As set forth above, Manufacturer Defendants' conduct was intentional, malicious, and in complete disregard of Plaintiffs' rights, subjecting Manufacturer Defendants to awards of punitive damages.

487.    As a result of Manufacturer Defendants' tortious conduct, Plaintiffs suffered bodily harm in the form of alteration of the physical condition, structure, and/or function of their bodies, resulting from their significant exposure to PFAS-contaminated water supplies.

488.    As a direct result of Manufacturer Defendants' conduct and resulting contamination of Plaintiffs' household water supply, water systems, private wells, and other property, by the toxic PFAS components of Manufacturer Defendants' AFFF, Plaintiffs have incurred, and will continue to incur, the injuries identified herein.

**EIGHTH CLAIM FOR RELIEF**

**VIOLATIONS OF CONSUMER PROTECTION ACT**

**(Manufacturer Defendants)**

489.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if they were fully set forth herein.

490.    Manufacturer Defendants' manufacturing, marketing, promoting, distributing, and/or sale of AFFF and other PFAS-containing products constitute "trade" or "commerce" within the meaning of the Consumer Protection Act (CPA), RCW 19.86.010(2).

491.    Manufacturer Defendants engaged in unfair and/or deceptive acts or practices within the meaning of RCW 19.86.020 by, *inter alia*, representing that its AFFF and other PFAS-containing products were safe while misrepresenting and omitting the risks associated with its AFFF and other PFAS-containing products.

492.    Manufacturer Defendants also engaged in unfair and/or deceptive acts or practices within the meaning of RCW 19.86.020 by, *inter alia*, omitting and/or failing to update its information and/or marketing materials with known, material risks associated with the use of AFFF and other PFAS-containing products.

493.    Manufacturer Defendants' misrepresentations were deceptive because they have the capacity to mislead a substantial number of consumers.

494.    These acts or practices occurred in trade or commerce because they occurred in connection with the sale of AFFF and other PFAS-containing products and such sale directly and indirectly affected Plaintiffs' properties and property rights.

495.    An act or practice may be unfair if it offends public policy; is immoral, unethical, oppressive, unconscionable; or causes injury to consumers; thus, Manufacturer Defendants' acts and/or omissions, as alleged in this Complaint, are unfair.

496.    The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies. Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

497.    Manufacturer Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness,

disease, and/or disease process.

498.    Manufacturer Defendants' acts and practices injured Plaintiffs and their properties by foreseeably causing Plaintiffs' household water supply to be contaminated by AFFF and other PFAS-containing products and forcing Plaintiffs to incur substantial response costs, as fully detailed herein.

**NINTH CLAIM FOR RELIEF**

**MTCA AND DECLARATORY JUDGMENT**

**(All Defendants)**

499.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if they were fully set forth herein.

500.    Pursuant to RCW 70A.305.020(24), Manufacturer Defendants and Defendant Fire District are persons.

501.    Under RCW 70A.305.020(13), the PFAS disposed of, deposited, and/or handled at the FS33 are "hazardous substances" as all types of PFAS are "hazardous substances" under MTCA.  WAC 173-303-090—100.[94]

502.    A release is "any intentional or unintentional entry of any hazardous substance into the environment, including but not limited to the abandonment or disposal of containers of hazardous substances."  Wash. Admin. Code § 173-340-200.  The use of hazardous substances at FS33 and other neighboring locations where AFFF was released constituted, and continue to constitute, releases for which remedial investigation and action has been and will continue to be necessary at the facility, within the meaning of RCW 70A.305.040(1)(e).

503.    During the period of operation of FS33, "releases" of "hazardous substances" occurred at FS33, as these terms are respectively defined in RCW 70.105D.020(32) and (13).

///

---

[94] *See also* Wash. Dep't of Ecology, *Focus on PFAS*, Pub. No. 21-09-060 (Oct. 2021), https://apps.ecology.wa.gov/publications/documents/2109060.pdf.

504.    FS33, and every place at which AFFF and other PFAS-containing products originating from FS33 came to be located on Plaintiffs' properties, including the HHWS and Plaintiffs' drinking water supplies to which Plaintiffs have rights, constitute "facilities" as defined in RCW 70A.305.020(8).

505.    Defendant Fire District currently operates, and at all relevant times operated, at FS33, a facility within the meaning of RCW 70.105D.040(1)(a) and RCW 70.105D.020(22), when PFAS were released into the environment around FS33.

506.    In purposefully discharging AFFF for decades, Defendant Fire District arranged for disposal of AFFF containing PFAS with the intent to dispose of the AFFF.

507.    Defendant Fire District is therefore a "person" liable under RCW 70.305.040(1)(e).

508.    Manufacturer Defendants are persons who owned or possessed PFAS, hazardous substances, and who by contract, agreement, or otherwise, arranged for disposal or treatment of the hazardous substance at FS33 and every place at which AFFF came to be located on Plaintiffs' properties.

509.    Manufacturer Defendants are also persons who sold hazardous substances and, on information and belief, were responsible for written instructions for their use within the meaning of RCW 70A.305.040(1)(e).

510.    On information and belief, the releases of hazardous substances at FS33 and other locations throughout the surrounding area where AFFF was released by Defendant Fire District occurred according to the instructions provided by Manufacturer Defendants.

511.    Manufacturer Defendants are therefore "persons" liable under RCW 70.305.040(1)(e).

512.    These releases caused, and will continue to cause, Plaintiffs to take and/or fund "remedial actions" as defined in RCW 70A.305.020(33).

513.    These remedial actions are, and will continue to be, when evaluated as a whole, substantially equivalent to remedial action conducted or supervised by the Washington State Department of Ecology.

514.    Defendant Fire District's releases of Manufacturer Defendants' hazardous substances at FS33 have resulted in the need for Plaintiffs to incur remedial action costs and attorneys' fees, and have further resulted in the need to incur future costs, including attorneys' fees, as a result of those actions.

515.    The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies. Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

516.    Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

517.    Manufacturer Defendants' sale of hazardous substances and provision of instructions on the use of said substances have resulted in the need for Plaintiffs to incur remedial action costs and have further resulted in the need to incur future costs, including attorneys' fees, as a result of those actions.

518.    Pursuant to RCW 70A.305.040(2) and RCW 70A.305.080, Defendants are strictly, jointly, and severally liable for any and all past and future costs related to the investigation and remediation of hazardous substances released at or from the facility, FS33, including any costs or attorneys' fees relating to releases or threatened releases of hazardous substances at, on, or from the facility.

519.    Under RCW 70A.305.080 and RCW 7.24.010, Plaintiffs are entitled to a declaratory judgment that Defendants are strictly and jointly and severally liable for any

and all past and future costs related to the investigation and remediation of hazardous substances released at the facility, including any costs or attorneys' fees incurred by Plaintiffs relating to releases or threatened releases of hazardous substances at, on, or from FS33.

## TENTH CLAIM FOR RELIEF

## COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT

### (Manufacturer Defendants)

520.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if they were fully set forth herein.

521.    Manufacturer Defendants are "persons," as defined by CERCLA § 101(21), 42 U.S.C. § 9601(21).

522.    FS33 and other locations where PFAS contamination has been found around Plaintiffs' properties are "facilities," as defined by CERCLA § 101(9), 42 U.S.C. § 9601(9).

523.    PFOA and PFOS are "hazardous substances" under CERCLA, 42 U.S.C. § 9601(14); see 42 U.S.C. § 6921.

524.    Other PFAS are expected to constitute hazardous substances once they are designated as hazardous wastes under RCRA.[95]   That is, PFAS beyond just PFOA and PFOS "cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness" and "pose a substantial present or potential hazard to human health and the environment" because they have been "improperly treated, stored, transported, or disposed of, or otherwise managed."

525.    FS33 currently operates, at and at all relevant times operated, at the facilities when PFAS were released into the environment at and around the facilities.

---

[95] 42 U.S.C. § 9601(14) ("hazardous substances" include "any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921]"); 42 U.S.C. § 6921 (listing characteristics of "hazardous wastes" under RCRA); 42 U.S.C. § 6903(5) (same).

526.    Through the discharge of AFFF at FS33 for decades without taking adequate measures to alert end users, Manufacturer Defendants also arranged for disposal of AFFF containing PFAS with the intent to dispose of the AFFF.

527.    Manufacturer Defendants are therefore "persons" liable under CERCLA § 107(a)(1)-(3), 42 U.S.C. § 9607(a)(1)-(3).

528.    Manufacturer Defendants arranged for the disposal of PFAS from locations neighboring FS33, including Plaintiffs' properties, by designing, manufacturing, marketing, selling, and/or providing instructions for the use of AFFF and other PFAS-containing products with the knowledge and specific intent that such products were hazardous and would be disposed into the environment in the course of the products' typical use.

529.    On information and belief, Manufacturer Defendants continued to design, manufacture, market, sell, and/or provide instructions for the use of AFFF products after and despite becoming aware of the nature of PFAS in AFFF as hazardous substances.

530.    On information and belief, Manufacturer Defendants knew that their PFAS-containing products were harmful to humans and the environment, and intentionally shielded that information from others.

531.    On information and belief, Manufacturer Defendants continued selling PFAS-containing products despite the environmental risks of which they were aware during phase-out periods.

532.    While doing so, Manufacturer Defendants were aware that its AFFF and other PFAS-containing products were likely to be globally phased out of the national market under pressure from the US EPA, yet continued to sell these products with the intent to dispose of them before anticipated regulatory actions would have precluded such sales.

533.    Defendant 3M in 2000 announced it would cease production and use of PFOS and PFOA.  By and well before this time, 3M knew or should have known that its products containing these chemicals posed serious environmental risks that, if known by the entities to whom 3M sold its products, would likely have caused some of those buyers

to decline to buy 3M's products.

534.    During the period in which 3M had knowledge of the serious risks posed by its PFAS-containing AFFF, including the period following 3M's 2000 announcement of the phase-out, disposal was, on information and belief, a primary benefit to 3M in selling its AFFF products.  Revenues from AFFF sales were incidental to the primary benefit of disposing of hazardous substances at no cost.

535.    On information and belief, Defendant Tyco also knew or should have known that its AFFF products containing PFOA (and other PFAS) posed serious environmental risks that, if fully understood by its customers, would have either precluded or at minimum reduced their sales of these products.

536.    On information and belief, before and during the US EPA PFOA Stewardship Program under which PFOA manufacturing and use was phased out, Manufacturer Defendants were aware that their Long Chain PFAS-containing foams would become unmarketable and/or unsaleable after the 2015 phase-out deadline.

537.    On information and belief, given their knowledge of environmental risks posed by their products and the impending phase-out deadline for PFOA, disposal of excess inventory of unusable hazardous substances was a primary goal and benefit to Manufacturer Defendants as they continued to sell these products during this period.

538.    Manufacturer Defendants are each therefore "persons" liable under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

539.    Manufacturer Defendants' disposal of PFAS are "releases" within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22), and have resulted in the contamination of Plaintiffs' properties.

540.    Manufacturer Defendants are responsible for PFAS releases that have caused Plaintiffs to incur, and continue to incur, "response costs" within the meaning of CERCLA §§ 101(23)-(25), 42 U.S.C. §§ 9601(23)-(25).

541.    All such costs are necessary and consistent with the National Contingency Plan.  40 CFR Pt. 300.  As described elsewhere, Plaintiffs' response is commensurate to

the health threat and treatment needs posed by PFAS contamination of their household water supplies.

542.   The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies. Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

543.   Plaintiffs are entitled to full reimbursement from Manufacturer Defendants for all such response costs, pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), as well as a declaratory judgment under CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), of liability for response costs that will be binding in any subsequent action to recover further response costs.

544.   Manufacturer Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

545.   Accordingly, Manufacturer Defendants are strictly, jointly, and severally liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), for all response costs incurred by Plaintiffs.

### ELEVENTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (Manufacturer Defendants)

546.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if they were fully set forth herein.

547.     Despite knowing of the toxic and hazardous nature of their products, Manufacturer Defendants supplied, manufactured, marketed, sold, and/or distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, and/or otherwise discharged, cleaned, and/or disposed of at FS33.

548.     Manufacturer Defendants acted in concert with others to conspire to defraud Plaintiffs.

549.     Manufacturer Defendants together, through their acts and omissions described above, and through the acts of other subsidiaries, joint ventures, and affiliates, including consulting firms, not named as defendants, conspired to perform unlawful acts or in the alternative did lawful acts in an unlawful way, and Manufacturer Defendants caused and/or contributed to releases of AFFF containing PFAS, which invaded Plaintiffs' properties and property interests.  Such releases caused unlawful trespass, nuisance, and negligence to Plaintiffs determinant.

550.     At all times relevant hereto, there existed a conspiracy between and among Manufacturer Defendants regarding manufacturing and/or sale of AFFF containing PFAS including, but not limited to, an agreement to, among other things, conceal the toxic nature of their products and the releases that would and did migrate to neighboring properties, resulting in contamination of Plaintiffs' properties.  Manufacturer Defendants committed acts in furtherance of their conspiracy including, but not limited to utilizing the best available technology and alternative products to prevent the mitigation of AFFF containing PFAS to Plaintiffs' properties.

551.     The agreement between Manufacturer Defendants, as set forth herein, to do an unlawful act or to do a lawful act in an unlawful way was a proximate cause of Plaintiffs' damages and losses.  As a direct, proximate, and foreseeable result of Manufacturer Defendants' acts and omissions, Plaintiffs have suffered damages and losses including, but not limited to costs of a program of medically necessary diagnostic testing for the early identification and detection of illness, disease, and/or disease processes associated with

significant exposure to chemical components of Manufacturer Defendants' AFFF containing toxic PFAS components.

552.    The toxic PFAS were absorbed, at a minimum, through Plaintiffs' gastrointestinal tracts, bioaccumulated in their bodies, and distributed to the organs of their bodies through their blood, which in turn altered the structure and function of their bodies. Plaintiffs absorbed PFAS-contaminated water into their body tissue and bloodstream, including to the target organs such as the kidneys, testicles, and thyroid, altering their bodies' biochemical processes, structure, and/or function in a way that leads to an increased risk of latent illness, disease, and/or disease process.

553.    Accordingly, Manufacturer Defendants are liable for compensatory damages to Plaintiffs.

554.    Manufacturer Defendants' conduct constitutes an invasion of Plaintiffs' legally protected interests in the form of past, present, and future increased risk of illness, disease, and/or disease process from their significant exposure to toxic PFAS components from Manufacturer Defendants' AFFF, and the present pecuniary loss of medically necessary diagnostic testing for the early detection of latent or unrecognized illness, disease, and/or disease process.

555.    Manufacturer Defendants' actions were, and continue to be, made with a willful, wanton, and conscious disregard for the rights or safety of Plaintiffs' properties, specifically, that Manufacturer Defendants knew or should have known that AFFF, and its toxic PFAS components, used at FS33 in an intended and foreseeable manner, would release PFAS contaminants into the environment and thereafter migrated into surrounding groundwater and the HHWS.

556.    It was reasonably foreseeable by Manufacturer Defendants that PFAS would be released into soil, groundwater, water systems, and water supplies by entities it sold and/or distributed AFFF.  It was further reasonably foreseeable that Manufacturer Defendants' AFFF would migrate into Plaintiffs' household water supplies.  Plaintiffs' possessory interests in their properties, and therefore the right to withdraw and/or use their

household water supply, has been invaded and contaminated, showing that Manufacturer Defendants prioritized profits over the health and safety of Plaintiffs.

557.    As a direct result of Manufacturer Defendants' conduct and resulting contamination of Plaintiffs' household water supply, water systems, well, piping, soil, vegetation, and other real property by the toxic PFAS components of Manufacturer Defendants' AFFF, Plaintiffs have incurred and will continue to incur the injuries identified above.

## TWELFTH CLAIM FOR RELIEF

## VIOLATION OF UNIFORM VOIDABLE TRANSACTIONS ACT

### (Formerly: Uniform Fraudulent Transfer Act)

### (E.I. du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.)

558.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if they were fully set forth herein.

559.    Plaintiffs seek equitable and other relief pursuant to the Washington Uniform Voidable Transactions Act, RCW 19.40 *et seq*. ("UVTA") against E.I. DuPont, Chemours, Chemours Company, Corteva, and DuPont (collectively the "DuPont Defendants").

560.    Under the UVTA, (1) a transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.  RCW 19.40.041.

561.    The DuPont Defendants have (a) acted with actual intent to hinder, delay, and defraud parties, and/or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

562.    The DuPont Defendants engaged in acts in furtherance of a scheme to transfer E.I. DuPont's assets out of the reach of parties such as Plaintiff that have been injured because of the Dupont Defendants' conduct, omissions, and actions described in this Complaint.

563.    It is primarily E.I. DuPont, rather than Chemours, that for decades manufactured, marketed, sold, and/or distributed AFFF containing toxic PFAS components with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through intended, normal, and foreseen uses, would contaminate Plaintiffs' household water supply and injure Plaintiffs.

564.    As a result of the transfer of assets and liabilities described in this Complaint, the DuPont Defendants have attempted to limit the availability of assets to cover judgments for all the liability for injuries from the manufacturing, marketing, sale, and/or distribution of AFFF containing toxic PFAS components.

565.    At the time of the transfer of its "Performance Chemicals Business" to Chemours, E.I. DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed, regarding DuPont's liability for injuries from the manufacturing, marketing, sale, and/or distribution of AFFF containing toxic PFAS components.

566.    The DuPont Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E.I. DuPont believed or reasonably should have believed that Chemours would incur debts beyond Chemours' ability to pay as they became due.

567.    At times relevant to this action, the claims, judgement, and potential judgments against Chemours potentially exceed Chemours' ability to pay.

568.    Pursuant to RCW 19.40.041, Plaintiffs seeks avoidance of the transfer of E.I. DuPont's liabilities for the claims brought in this Complaint and to hold the DuPont Defendants liable for any injuries or other remedies that may be awarded under this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the Court to enter judgement against Defendants, as follows:

(a)    an award to Plaintiffs for compensatory and consequential damages, and/or equitable relief, including interest, in an amount to be proven at trial;

(b)    an award to Plaintiffs of the costs of diagnostic testing for the early detection of latent or unidentified disease associated with their exposure to the toxic PFAS components of Manufacturer Defendants' AFFF, or, alternatively, injunctive relief, including but not limited to, the implementation and funding of a court-supervised medical monitoring program sufficient to ensure the beneficial early detection of latent or unidentified disease for Plaintiffs exposed to the toxic PFAS components of Manufacturer Defendants' AFFF;

(c)    for disgorgement of the profits and savings which were obtained by the unjust enrichment of Manufacturer Defendants through their manufacture, sale, and/or distribution of AFFF containing toxic PFAS components and through the use and at the expense of the properties of Plaintiffs;

///
///
///
///
///
///

1    (d)    that this matter be scheduled for a jury trial;

2    (e)    an award of attorneys' fees and costs as allowable by law;

3    (f)    an award of pre- and post-judgment interest, as provided by law; and

4    (g)    such other and further relief as the court deems proper.

5

6    Dated:  August 12, 2025                    SINGLETON SCHREIBER, LLP

7                                              By:  /s/ *Kevin S. Hannon*
                                                   _____

8                                              Kevin S. Hannon
                                               *Pro Hac Vice*
9                                              Singleton Schreiber, LLP
                                               1641 N. Downing Street
10                                             Denver, CO 80218
                                               (720) 704-6028
11                                             khannon@singletonschreiber.com

12                                             Daniel Fruchter, WSBA No. 63591
                                               dfruchter@singletonschreiber.com
13                                             Vanessa Waldref, WSBA No. 44396
                                               Singleton Schreiber, LLP
14                                             108 N. Washington St., Suite 603
                                               Spokane, WA 99201
15                                             (509) 824-6222
16                                             vwaldref@singletonschreiber.com

17                                             Gerald Singleton, WSBA No. 59010
                                               Singleton Schreiber, LLP
18                                             591 Camino de la Reina, Suite 1025
                                               San Diego, CA 92108
19                                             (619) 771-3473
                                               gsingleton@singletonschreiber.com

20

21                                             Attorneys for Plaintiffs

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT - 119